# United States Court of Appeals for the Federal Circuit

---

**KELLOGG BROWN & ROOT SERVICES, INC.,**
*Appellant*

**v.**

**SECRETARY OF THE ARMY,**
*Appellee*

---

2019-1683

---

Appeal from the Armed Services Board of Contract Appeals in Nos. 57530, 58161, Administrative Judge Mark A. Melnick, Administrative Judge Owen C. Wilson, Administrative Judge Richard Shackleford.

---

Decided: September 1, 2020

---

EDWARD SANDERSON HOE, Covington & Burling LLP, Washington, DC, argued for appellant. Also represented by RAYMOND B. BIAGINI, HERBERT L. FENSTER; ALEJANDRO LUIS SARRIA, JASON NICHOLAS WORKMASTER, Miller & Chevalier Chartered, Washington, DC.

DAVID W. TYLER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee. Also represented by ETHAN P. DAVIS, RUSSELL B. KINNER, WILLIAM JAMES GRIMALDI, ROBERT EDWARD KIRSCHMAN, JR., PATRICIA M. MCCARTHY,

MICHAL L. TINGLE, ANDY J. MAO, PATRICK KLEIN, II; CAROL
MATSUNAGA, Defense Contract Management Agency, Car-
son, CA; KARA KLAAS, Chantilly, VA.

———————————

Before NEWMAN, DYK, and WALLACH, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK.

Dissenting opinion filed by *Circuit Judge* NEWMAN.

DYK, *Circuit Judge.*

Kellogg Brown and Root Services, Inc. ("KBR") con-
tracted with the government to provide trailers to house
coalition personnel at military camps in Iraq. KBR claimed
that the government breached the contract by failing to
provide "force protection" to the trucks delivering the trail-
ers to the military camps. KBR sought to recover payments
made to its subcontractor, First Kuwaiti Co. of Kuwait
("Kuwaiti"), for costs caused by the government's alleged
breach. The administrative contracting officer in large
part denied the claim, and KBR appealed to the Armed Ser-
vices Board of Contract Appeals ("Board"). The Board
found that KBR was not entitled to any additional recovery
and denied its appeal.

We affirm the Board's decision on the ground that the
Board properly determined that KBR's costs had not been
shown to be reasonable, and we do not reach the question
whether the government breached the "force protection"
provision of the contract.

## BACKGROUND

In 2001, the United States Army awarded Contract No.
DAAA09-02-D-0007 ("Contract 0007") in the U.S. Army's
Logistics Civil Augmentation Program ("LOGCAP III") to
KBR. Among other things, the contract required KBR to
provide logistical support in the form of goods (such as
trailers used for temporary housing) for the government

pursuant to a series of task orders.  LOGCAP III contained a provision ("the Force Protection Clause") requiring that the Army provide "force protection" for the contractor's convoys for providing these goods and services.  It stated:

> H-16 Force Protection
>
> While performing duties [in accordance with] the terms and conditions of the contract, the Service Theatre Commander will provide force protection to contractor employees commensurate with that given to Service/Agency (e.g. Army, Navy, Air Force, Marine, DLA) civilians in the operations area unless otherwise stated in each task order.

J.A. 242.

In June 2003, the government executed Task Order 59, a cost-plus-fixed-fee order for KBR to provide support to operations in Iraq.  This case concerns the government's October 10, 2003, modification to Task Order 59 ("Change 5"), which required KBR to "provide accommodations and life support services to [Command Joint Task Force 7 ("CJTF7")] and coalition forces in various locations in Iraq." J.A. 291.  The "accommodations and life support services" were trailers for temporary housing of Army personnel. Change 5 states that "[i]t is the Commander's intent to rapidly bed down the remainder of CJTF soldiers, building within battalion sets, simultaneously as opposed to sequentially, in accordance with established and provided priorities."  *Id.*  KBR was originally required to furnish the trailers by December 15, 2003.

The trailers were to be manufactured in Kuwait and then transported to Iraq by Kuwaiti in truck convoys.  Section 1.10 of Change 5 again addressed the issue of force protection, stating that "[t]he government will provide for the security of contractor personnel in convoys and on site, commensurate with the threat, and [in accordance with]

the applicable Theater Anti-Terrorism/Force Protection guidelines." J.A. 292.

On October 17, 2003, KBR and Kuwaiti entered into a firm-fixed-price subcontract ("the Subcontract") for the procurement and delivery of 2,252 trailers to Camp Anaconda in fulfillment of part of KBR's obligations under Change 5. In accordance with Change 5, the Subcontract required Kuwaiti to complete performance by December 15, 2003, with "[a]llowances" in the event of "delays in KBR convoy coordination and support." J.A. 1153. The Subcontract provided that if KBR ordered any changes to performance that resulted in an increased cost of performance to Kuwaiti, Kuwaiti would be entitled to request an equitable adjustment. On December 13, 2003, KBR issued another change order, directing Kuwaiti to deliver and install an additional 1,760 trailers to a second Army camp in Iraq, Camp Victory.

The Army's failure to provide force protection in Iraq became an issue between the government and KBR, and another such dispute resulted in a previous Board decision finding that the Army failed to meet its force protection obligations. *See Sec'y of the Army v. Kellogg Brown & Root Servs., Inc.*, 779 F. App'x 716, 718 (Fed. Cir. 2019). As relevant here, the Board found that by late November of 2003, "dangerous conditions in Iraq" and "limitations upon the military's resources to escort convoys" and the prioritization of other Army needs resulted in the failure to provide necessary force protection and convoy delays. J.A. 7.

Kuwaiti alleged that the delays resulted in delivery delays and a backup of trailers at the Kuwait/Iraq border. It alleged that it was eventually required to store the trailers on rented land (a "laydown yard") in Kuwait and incurred

costs for double handling, i.e., unloading and then reloading the trailers onto its trucks.[1]  J.A. 7.

On August 1, 2004, and August 4, 2004, KBR and Kuwaiti executed two change orders adding a total of $48,754,547.25 in equitable adjustments for idle truck costs due to the backup of trailers at the border and double-handling costs.

As would be expected, KBR, as the prime contractor, then filed two requests for equitable adjustments with the government, asserting that it was entitled to recover the payment to Kuwaiti because the delay and double-handling costs were due to the government's failure to provide the required force protection.  The final amount sought by KBR, which included the $48,754,547.25 paid to Kuwaiti as well as indirect costs and the award fee,[2] totaled $51,273,482.

On July 29, 2011, the administrative contracting officer issued a final decision allowing $3,783,005 in costs associated with the land leased to store the trailers (including indirect costs and award fees) but rejecting the remainder of KBR's requested costs for delay and double handling.

KBR timely appealed to the Board, arguing that it was entitled to recover the rejected delay costs and double-handling costs because the government violated the contract by failing to provide the required force protection.  It

---

[1]  "The term 'double handling' . . . refer[red] to both the transfer on and off trucks at the camps [due to delays in site preparation], as well as onto and off the [laydown yard]."  J.A. 8.

[2]  Under the Federal Acquisition Regulation ("FAR"), an "award fee" is "an award amount, based upon a judgmental evaluation by the Government, sufficient to provide motivation for excellence in contract performance."  48 C.F.R. § 16.305.

argued that it was entitled to recover the disallowed costs ($47,490,477) and that these costs were reasonable.

The Board found that KBR was not entitled to reimbursement on the ground that the government had not breached the Force Protection Clause because "nothing in Change 5 required the government to place [Kuwaiti]'s trailers into convoys without delay."  J.A. 16.  The Board further concluded that even if the government had breached the contract by failing to meet its force protection obligations, KBR had not shown that its settlement costs with Kuwaiti were reasonable.  The Board concluded that (1) "KBR ha[d] not shown that a prudent person conducting a competitive business would have resolved [Kuwaiti]'s delay [equitable adjustment] based upon the model submitted by [Kuwaiti]," J.A. 21, and (2) for similar reasons, "KBR ha[d] not shown that its settlement of the double[-]handling [equitable adjustment] . . . was reasonable," J.A. 22.  The Board stated that KBR had failed to provide the actual costs incurred by Kuwaiti, as is typical in claims for equitable adjustments in other contracts.  Instead, KBR's claimed costs were based solely on Kuwaiti's estimates.  The Board found that the damages models were "unrealistic," "inconsistent," "flaw[ed]," "unreasonable" and assumed a "perfect world."  J.A. 10, 17–18, 21.  The Board concluded that "KBR [was] not entitled to any recovery."  J.A. 22.

KBR appeals, and we have jurisdiction under 41 U.S.C. § 7107(a)(1)(A) and 28 U.S.C. § 1295(a)(10).

## DISCUSSION

Our review of the Board's decision is limited by statute. *See* 41 U.S.C. § 7107.  We review the Board's legal conclusions de novo, but we may only set aside a factual finding if it is "(A) fraudulent, arbitrary, capricious; (B) so grossly erroneous as to necessarily imply bad faith; or (C) not supported by substantial evidence."  *Id.* § 7107(b).  Contract interpretation is a question of law.  *Agility Logistics Servs.*

*Co. KSC v. Mattis*, 887 F.3d 1143, 1148 (Fed. Cir. 2018).
The reasonableness of a cost is a question of fact based on
applicable legal principles. *Kellogg Brown & Root Servs.,
Inc. v. United States*, 728 F.3d 1348, 1360 (Fed. Cir. 2013).

I

KBR argues that, under Change 5, the government was
obligated to "furnish convoy escorts well before the
[Change 5] deadlines," Appellant's Br. 19, and that but for
the government's breach, KBR would have been able to
"meet the express dates for trailer installation," Reply
Br. 12. We need not reach the issue of whether the govern-
ment breached the contract by failing to provide adequate
force protection because the Board did not err in concluding
that KBR's claimed costs were not shown to be reasonable
(a prerequisite to its requested relief). *See Castle v. United
States*, 301 F.3d 1328, 1341 (Fed. Cir. 2002) ("[W]e find that
[the plaintiffs] have not established their entitlement to
damages . . . . Accordingly, . . . we expressly decline to con-
sider the liability issue."). In addressing the issue of cost
reasonableness, we assume that the government was re-
quired to provide reasonable force protection to enable
KBR to timely perform under the contract.[3]

Before addressing the reasonableness issue, we note
that the government argues on appeal that KBR was re-
quired to submit not only the actual costs that KBR in-
curred, but the actual costs incurred by its subcontractor,
Kuwaiti. It argues that under the Subcontract, Kuwaiti
was required to maintain "'records [that] relate to cost re-
imbursement,' and provide to KBR '[c]opies of documents

_____

[3]    However, as the Board found, nothing in Change 5,
including the Force Protection Clause, "constituted a guar-
antee by the government that its convoy security would en-
able KBR to comply" with the December 15, 2003,
completion date. J.A 16.

and records supporting requests for payment.'" Appellee's
Br. 53 (alterations in original) (quoting J.A. 1166). The
government's reliance on the Subcontract is misplaced. As
the government conceded at oral argument, the amounts
paid by KBR to Kuwaiti were "costs" under the prime con-
tract, and there is no provision in the prime contract that
required KBR to submit the actual costs incurred by its
subcontractor. KBR's obligation was to show that the pay-
ments to Kuwaiti were "reasonable." *See* 48 C.F.R.
§ 31.201-2(a)(1). While the failure to collect and submit
Kuwaiti's costs bears on the reasonableness of the pay-
ments, submission of the subcontractor's costs is not a sep-
arate requirement.

The FAR provides:

> A cost is allowable only when the cost complies
> with all of the following requirements: (1) Reason-
> ableness . . . .

*Id.* § 31.201-2(a).

> (a) A cost is reasonable if, in its nature and amount,
> it does not exceed that which would be incurred by
> a prudent person in the conduct of competitive
> business. Reasonableness of specific costs must be
> examined with particular care in connection with
> firms or their separate divisions that may not be
> subject to effective competitive restraints. No pre-
> sumption of reasonableness shall be attached to
> the incurrence of costs by a contractor. If an initial
> review of the facts results in a challenge of a spe-
> cific cost by the contracting officer or the contract-
> ing officer's representative, the burden of proof
> shall be upon the contractor to establish that such
> cost is reasonable.

> (b) What is reasonable depends on a variety of con-
> siderations, including . . . [g]enerally accepted
> sound business practices, arm's length bargaining,

and . . . [a]ny significant deviations from the contractor's established practices.

*Id.* § 31.201-3 (emphasis added).

The FAR thus makes clear that the burden is on the contractor to establish the reasonableness of its costs and that there is no presumption of reasonableness. We have similarly explained that there is no presumption that a contractor is entitled to reimbursement "simply because it incurred . . . costs." *Kellogg*, 728 F.3d at 1363.

## A

KBR only devotes two pages of its brief to defending the reasonableness of its costs and fails to describe in any detail KBR's cost calculation methodology or why its methodology was reasonable. This alone would justify affirmance, since KBR has not meaningfully briefed the issue. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006). We nevertheless have looked to KBR's justifications for its claimed costs (as argued to the Board) to determine whether the costs were reasonable. We begin with KBR's arguments directed to the alleged delays at the Iraq/Kuwait border.

KBR stated that the claimed costs related to delays were not based on documented costs incurred by Kuwaiti, but were instead estimated "based upon 83,078 days of idle truck time and a truck and driver daily cost rate of $300." J.A. 2928. We briefly describe how KBR arrived at those numbers.[4]

Under Change 5, KBR was required to deliver 2,252 trailers to Camp Anaconda and 1,760 trailers to Camp

---

[4]    In its certified claim, KBR used the same estimates that Kuwaiti used in its original request for equitable adjustments. For convenience, we refer to these as KBR's estimates.

Victory by December 15, 2003. It was understood as a practical matter that the delivery of the trailers would occur over the entire period of performance. KBR began with the assumption that, if the government had provided adequate force protection, Kuwaiti would have delivered a uniform number of trailers each day to each camp. Under this assumption, KBR estimated that it would have delivered 135 and 58 trailers per day for Camp Victory and Camp Anaconda, respectively, to complete the deliveries in accordance with the December 15, 2003, deadline in Change 5. This translated to an assumption that 193 trucks would have crossed the Iraq/Kuwait border each day during the original period of performance. We refer to this as the "uniform rate assumption."

KBR then assumed that any deviation from the uniform rate assumption was attributable to government-caused delay. To calculate the number of supposedly idle trucks on a particular day, KBR subtracted the total number of trucks that had crossed the border (from the start date of the Subcontract up to that day) from the total number of trucks that would have crossed the border under the uniform rate assumption. For example, if, on a particular day, Kuwaiti's records showed that a total of 100 trucks had crossed the border, but 193 trucks would have crossed the border under the uniform rate assumption, KBR's model would claim 93 idle truck days. KBR then multiplied the total number of idle truck days by $300, which it adopted as a "reasonable market price for idle trucks based upon a review of other business KBR conducted." J.A. 17.

There are several reasons why KBR's model is not a reasonable cost calculation—each of which, standing alone, is sufficient to defeat its claims.

First, contrary to KBR's model, the Board found that Kuwaiti "did not always have the number of trucks available at the border dictated by the model or have access to the model's required number of trucks." J.A. 10. "In fact,

it was not known where all the trucks were at any given time." *Id.* A December 15, 2003, email from the Operations Manager at Camp Anaconda stated that Kuwaiti did not have trailers ready at the border, and that, "[w]hile [Kuwaiti] may have [had] hundreds of trailers waiting at the border, they apparently [were] not bound for [Camp] Anaconda." J.A. 4065. KBR assumed "perfect performance where everything worked flawlessly" on the part of Kuwaiti (despite records showing the contrary). J.A. 10. As the Board found, "KBR has not demonstrated that [the] model approximates the actual events that occurred." J.A. 18.

Indeed, the Board found that KBR's estimates as to the number of trucks at the border were inconsistent with the only evidence that KBR did submit. For example, "[Kuwaiti] reported on December 2, 2003, that it had 150 trucks waiting, but the model charged for 403 [idle truck days]." J.A. 10. The Board noted that "[Kuwaiti] and KBR also maintained status reports showing the number of trailers waiting at the border on specific days, and a Delivery Report for particular days showing the number of trailers waiting on trucks," and that "[t]hese reports generally showed lower numbers than" KBR's estimates. *Id.* Finally, the Board cited "numerous communications" attached to the request for equitable adjustment "discussing significantly different numbers of trucks and trailers available at the border than shown in the [KBR] model." *Id.* KBR provided no explanation for why its model could be reliable when it was "inconsistent" with the records that Kuwaiti did maintain. J.A. 9.

Second, KBR's model "assumed [that] every truck arriving at the [Iraq/Kuwait] border would be placed into a convoy for Iraq the very next day" and that all delays at the border were the result of inadequate government force protection. J.A. 10. In fact, substantial evidence supported the Board's findings that other factors outside of the government's control (in addition to KBR's delay in providing trucks at the border) contributed to delays. *See Sauer Inc.*

*v. Danzig*, 224 F.3d 1340, 1348 (Fed. Cir. 2000) ("[T]o establish a compensable delay, a contractor must separate government-caused delays from its own delays."). Even with "unlimited force protection assets, security threats and other constraints, such as the status of communication lines," "intelligence [reported] that the roads were too dangerous for travel at all," and insurgent attacks could delay the delivery of the trailers. J.A. 6. Yet KBR assigned every delay at the border to the lack of force protection without attempting to disaggregate the causes of those delays. KBR's assumption was simply "not realistic." J.A. 10.

Third, KBR's spreadsheets calculating idle truck days, "without substantiating data or records," were insufficient to establish the reasonableness of its costs. J.A. 9. KBR offered no fact or expert witnesses to support the reasonableness of its estimated number of idle truck days. Although Change 5 did not require KBR to provide actual costs to support its claim, the Board properly determined that KBR's failure to provide any supporting data was fatal to its claim. Under KBR's contract with Kuwaiti, Kuwaiti was obligated to "maintain books and records" reflecting actual costs, and KBR had the right to "inspect and audit" those records. J.A. 1166. As the Board found, it was simply not plausible that Kuwaiti did not record "how long trucks actually waited" at the border, J.A. 18, and KBR made no attempt to access or utilize these records. At bare minimum, KBR was required to support its estimates with representative data as to the number of trucks actually delayed. In fact, KBR supplied no representative data whatsoever. Without further evidence demonstrating the reliability of KBR's estimates, the Board properly found that KBR's claimed costs were not reasonable.

Fourth, KBR only offered conclusory testimony, unsupported by any data or evidence in the record, that the daily rate of $300 was a reasonable "composite rate" for each truck, trailer, and driver, "based on [KBR's] market research and . . . pricing data available . . . at the time."

J.A. 3002.   In fact, KBR knew (from the redacted truck leases submitted by Kuwaiti) that Kuwaiti had records showing more precise daily costs for its idle trucks.   The Board found that "[i]t simply strain[ed] credulity" that Kuwaiti, a "sophisticated company" having "over 70 subcontracts with KBR alone," would "not record how much it actually paid its drivers while they waited at the border . . . , especially given that it would ultimately seek millions of dollars in additional compensation for these events." J.A. 18. At oral argument, the only reason KBR gave for its failure to inquire into the costs charged by Kuwaiti was that it "wanted to move this matter along." Oral Arg. at 40:08–12.   The Board properly concluded that KBR's testimony did not establish what Kuwaiti "actually paid to lease the trucks (which [Kuwaiti] knew but did not disclose) and how much it actually paid its drivers." J.A. 18.

Finally, KBR charged a $300 rate for all claimed delay days, implicitly assuming that each trailer was always attached to a truck with a driver. This was despite the fact that Kuwaiti was also claiming double-handling costs for the trailers, which it claimed were offloaded and stored—unattached to any trucks—in its laydown yard. The basis for claiming additional delay costs related to drivers and trucks for such stored trailers was not explained and, as the Board found, "ignored the fact that, once [Kuwaiti] procured land for a laydown yard at the border, it removed the trailers from trucks and placed them in the yard, relieving at least some trucks and drivers from having to remain idle the entire time the trailers were delayed." J.A. 18.

In *Kellogg*, another case between the same parties, KBR "declined to present independent evidence of the reasonableness of . . . [its] costs." *Kellogg*, 728 F.3d at 1363. We held that KBR failed to satisfy its burden of proving the reasonableness of its costs. *Id.*   The record in this case leads to the same result.   Despite having ample opportunity to do so, KBR supplied no meaningful evidence to

the Board showing the reasonableness of its costs, nor has it explained the inconsistencies between its proposed cost model and the factual record.

We conclude that the Board's determination that KBR had failed to demonstrate that its delay costs were reasonable was supported by substantial evidence.

B

We turn to KBR's costs related to double handling. Here, KBR sought reimbursement for the cost of the entire facility used to store the trailers, apparently on the theory that every cost related to the facility was attributable to the alleged government delay.[5] In this respect, KBR's double-handling claim suffered from many of the same deficiencies as its delay claim. There were, in addition, other deficiencies.

KBR failed to support the reasonableness of its claimed costs with any record evidence. Although KBR stated that it "engaged . . . procurement personnel to obtain pricing from sources other than [Kuwaiti] to negotiate the double[-]handling claim," J.A. 2927, its certified claim for double-handling costs contained only spreadsheets summarizing monthly costs. KBR never submitted pricing data from its other sources.

Not only was the pricing not supported—the description of the work performed was lacking in necessary detail or described work unrelated to any government-caused delay. Kuwaiti had claimed costs related to "skilled workers," at various rates (ranging from $2,000 to $3,500 per person per month) without explaining what these workers did, or

---

[5]    KBR also sought costs related to double handling due to "late site preparation." J.A. 21. As with KBR's other double-handling costs, it failed to support these claimed costs with adequate data.

even what their "skills" were.  J.A. 8.  Kuwaiti also charged $3,090,750 in "Repair Cost Consequent on Double Handling [sic]."  J.A. 4798.  The administrative contracting officer noted that, while "some damage [to the trailers] will occur during double handling," "some of the damage charged [for] in the [equitable adjustment] was also apparently attributed to vandalism."  J.A. 1892.  KBR's submissions to the Board "did not describe any [double-handling] repairs, or what might have happened to require any [repairs]."  J.A. 8.  KBR simply made no effort to "field verify any additional equipment, manpower, protection, land preparation, repairs, and double installations" from the double handling.  J.A. 12.

KBR itself expressed concern with the reasonableness of Kuwaiti's proposed double-handling costs, stating that Kuwaiti's quoted prices were "too high" and that "if this was a claim and if this was being assessed as per the FAR[] . . . there would be a very high possibility that this would be dismissed."  J.A. 4800.  KBR also noted during its negotiations with Kuwaiti that "the numbers [of trailers] that were said to have been repaired daily . . . [did] not add up."  J.A. 4801.

Under these circumstances, we conclude that the Board did not err in finding that KBR had failed to prove the reasonableness of its double-handling costs.

## II

KBR finally argues on appeal that the Board failed to apply the "jury verdict" method.  The jury verdict method is "not favored and may be used only when other, more exact, methods cannot be applied."  *Dawco Const., Inc. v. United States*, 930 F.2d 872, 880 (Fed. Cir. 1991), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995).  As previously discussed, KBR has not shown that other, more exact, methods were unavailable.  We affirm the Board's holding that "[t]he jury verdict

method does not relieve KBR from FAR Part 31's limitation of its recovery to costs that are reasonable."  J.A. 21.

**AFFIRMED**

# United States Court of Appeals
# for the Federal Circuit

_____

**KELLOGG BROWN & ROOT SERVICES, INC.,**
*Appellant*

**v.**

**SECRETARY OF THE ARMY,**
*Appellee*

_____

2019-1683

_____

Appeal from the Armed Services Board of Contract Appeals in Nos. 57530, 58161, Administrative Judge Mark A. Melnick, Administrative Judge Owen C. Wilson, Administrative Judge Richard Shackleford.

_____

NEWMAN, *Circuit Judge*, dissenting.

With the expedition of United States forces to Iraq, the Army contracted with Kellogg Brown & Root Services, Inc. ("KBR") for various services including the provision of prefabricated housing for thousands of troops. As described by the Armed Services Board of Contract Appeals ("ASBCA"),[1] "soldiers slept wherever they could

_____

[1]    *Kellogg Brown & Root Servs., Inc.*, ASBCA No. 57530, 19-1 BCA ¶ 37,205, 2018 WL 6431434 (Nov. 19, 2018) ("ASBCA Op.").

in . . . abandoned schools, . . . tents, vehicles, the ground, or any other place soldiers could put a sleeping bag." ASBCA Op. at 2. By contract LOGCAP III, KBR would "provide accommodations and life support services to [the soldiers] and coalition forces in various locations in Iraq . . . to rapidly bed down the remainder of [the soldiers]." J.A. 291. This "Bed Down Mission" was a priority Army activity, scheduled to be completed before Christmas 2003, for reasons of both morale and military preparedness. The ASBCA reports that over 18,000 such living trailers were included, for multiple military locations. ASBCA Op. at 2.

KBR and subcontractor First Kuwaiti Trading Company ("FKTC") designed, furnished, equipped, and brought to the Kuwait-Iraq border the contracted living trailers. However, delivery was often delayed due to unavailability of military force protection for convoys and installation. KBR paid an equitable adjustment to FKTC for this delay, but the ASBCA denied reimbursement to KBR, on the grounds that the government had not breached its obligation to provide force protection, and also that KBR had employed an incorrect methodology for calculating the equitable adjustment.

On KBR's appeal, my colleagues on this panel, while correctly rejecting the ASBCA's reasons for denying compensation as contrary to the contract, nonetheless err in implementing the correct standard. My colleagues hold that the correct standard is "reasonableness," and while complaining about the absence of evidence and witnesses and argument on this standard, my colleagues make extensive findings on information that has not been presented, and decide the issue of reasonableness without participation of the parties.

Thus the panel majority now finds that our new standard is not met, and denies all reimbursement. From this

flawed procedure and incorrect result, I respectfully dissent.

## DISCUSSION

At issue in this appeal is the measure of damages for government-caused delay in performance of the contract to provide 2,252 living trailers for installation at Camp Anaconda by December 15, 2003, and 1,760 trailers for Camp Victory with completion extended to January 1, 2004. KBR and its subcontractors designed, obtained, furnished, equipped, and trucked the trailers to the Kuwait-Iraq border. The war was active, and transport along the main supply route from Kuwait was under attack, as the ASBCA reported:

> Because there was a war on, MSR [Main Supply Route] Tampa was extremely dangerous. Insurgent attacks began in the spring of 2003 and people were shot and killed. Among those who frequently lost their lives were KBR affiliate personnel. . . . In June 2003, the military imposed movement restrictions, requiring military control and escorts into Iraq of all assets, including contractors.

ASBCA Op. at 4–5 (internal citations omitted). The KBR contract and subcontracts required the government to provide force protection for delivery and installation of the trailers:

H-16 <u>Contractor Force Protection</u>

While performing duties [in accordance with] the terms and conditions of the contract, the Service Theater Commander will provide force protection to contractor employees commensurate with that given to Service/Agency (e.g. Army, Navy, Air Force, Marine, DLA) civilians in the operations area unless otherwise stated in each task order.

J.A. 242; *see also* J.A. 1157 (Subcontract 11, Prime Contract). The ASBCA found that "[b]ecause of the dangerous conditions in Iraq, and the limitations upon the military's resources to escort convoys, trailers backed up at the Kuwait/Iraq border waiting for escorts." ASBCA Op. at 6. Despite the priority of the Bed Down Mission, due to delays in military force protection the delivery of living trailers to Camp Victory was not completed until May 10, 2004, and to Camp Anaconda on June 28, 2004.

By its subcontract, FKTC was entitled to an equitable adjustment if government or KBR delay caused substantially increased cost or time of performance:

> § 3.2.5.    If [FKTC's] performance of the Sublet Work is delayed by [the government or KBR's] failure to perform their obligations hereunder, or by orders of [KBR] delaying or suspending the work, [FKTC] shall be entitled to an equitable adjustment in the compensation or time of performance, or both, if the delay substantially increases the cost to [FKTC] of the Sublet Work or the time that [FKTC's] equipment and forces are required at the site.

J.A. 1162 (LOGCAP III); *see also* J.A. 1176–77 (Subcontract 11, Special Provisions, §§ 4.2, 4.4).

The ASBCA acknowledged that "Under the subcontract, KBR was responsible for paying an 'equitable adjustment' to FKTC in the event of a government performance failure causing delay." ASBCA Op. at 16. KBR and FKTC negotiated this adjustment, and KBR paid the negotiated amount. However, the ASBCA refused to reimburse KBR for this payment, or any portion thereof. That is the subject of this appeal.

A

It is not disputed that five to eight months of delays in delivery occurred due to the unavailability of force

protection, and that trailers "piled up" at the Kuwait-Iraq border.  It is not disputed that heavy costs were incurred: costs of storage, handling, maintenance, repairs, personnel, and vandalism.  KBR and FKTC agreed to the adjustment methodology of a fixed sum of $300 per delay day per trailer.  The ASBCA disapproved of this methodology as not in conformity with the Federal Acquisition Regulation ("FAR"), and held that none of the equitable adjustment would be reimbursed.

I agree with my colleagues that the ASBCA applied an incorrect standard for measuring delay damages.  As the majority reports, at the oral argument of this appeal the government conceded that "there is no provision in the prime contract that required KBR to submit the actual costs incurred by its subcontractor."  Maj. Op. at 8.  Thus I agree that the ASBCA's decision must be vacated.

I also agree that the correct standard is "reasonableness."  However, my colleagues do not remand for application by the ASBCA of this standard; they do not discuss whether the methodology used by KBR was reasonable, although this aspect was the subject of testimony at the ASBCA; and they do not consider whether any of the costs of delay were reasonable in the circumstances that existed.  Instead, my colleagues extract isolated costs from un-briefed documents, and rule, with no briefing and no argument, that reasonableness was not shown.

Although KBR requested remand to the ASBCA if this court agrees that the ASBCA's decision should be reversed, remand is not provided.  KBR has no opportunity to meet this court's new standard.  Instead, my colleagues scavenge among assorted materials that were provided in other contexts, and complain about the absence of evidence and expert testimony related to the court's new standard.

B

The ASBCA also held that "nothing in Change 5 required the government to place FKTC's trailers into

convoys without delay." ASBCA Op. at 15. The government argues that FKTC "assumed the risk" of delay, and that the government had not breached its contractual obligation to provide force protection. That is incorrect, and in a related case concerning the same contract, the ASBCA held that the government's failure to provide force protection was indeed a breach of contract.

In companion litigation on the same contract requirement, the ASBCA found that the government breached its contract obligation, when the Army "did not have sufficient resources to provide . . . protection to KBR[ ]." *Kellogg Brown & Root Servs., Inc.*, ASBCA No. 56358, 17-1 BCA ¶ 36,779, 2017 WL 2676674 (June 8, 2017).

The Federal Circuit affirmed that the contract was breached by the Army's insufficiency "to provide military escorts for its contractors and several KBR employees and subcontractors were killed in the attacks," stating that the breach "eviscerated the promise at the heart" of the contract. *Sec'y of the Army v. Kellogg Brown & Root Servs., Inc.*, 779 F. Appx 716, 717, 719 (Fed. Cir. 2019).

That final decision estops the government's present argument that the failure to provide force protection did not breach the contract. My colleagues state that they do not reach the question of breach, but they nonetheless appear to give weight to the government's argument that it was the war, not the government, that caused the Army's delays in providing force security. The government states that the delays were due to "efforts to militarily secure the country, discovery of explosives on the roads, and other reasons that inevitably occur while performing such operations over the extended distances in a warzone," Govt. Br. 19 (internal quotation marks omitted).

The panel majority agrees that "factors outside of the government's control" contributed to the delays, and appears to deem such factors to weigh on the side of withholding the contract-mandated adjustment for delays in delivery and installation of the living trailers. Maj. Op. at

11.  However, an equitable adjustment is required by contract, and reinforced by the breach.

## C

The issue before the ASBCA was the reasonableness of the methodology used to measure the equitable adjustment that KBR paid.  The ASBCA held that the FAR requires actual costs and payments, and rejected the KBR methodology of negotiating a daily lump sum.

KBR summarized that costs arose from the delay-required storage, maintenance, handling, and repairs of trailers and trucks, as well as personnel costs and site preparation and installation.  KBR argued to the ASBCA that its methodology was reasonable.  Although my colleagues reject the ASBCA's requirement of detailed cost and payment records, my colleagues criticize the pieces of cost data that they can scour from various documents, and summarily deny all recovery.  The court complains about the absence of evidence and expert testimony[2]—although the court does not remand for evidence and expert testimony.

The court denies KBR the opportunity to demonstrate reasonableness, and appears to require the same degree of detail for which the court has reversed the ASBCA. The court criticizes the absence of detailed evidence, stating that "KBR only devotes two pages of its brief to defending the reasonableness of its costs."  Maj. Op. at 9.  The court ignores that KBR's action in the ASBCA was to support the methodology by which it settled the equitable adjustment

---

[2]    The panel majority complains that "KBR offered no fact or expert witnesses to support the reasonableness of its estimated number of idle truck days," Maj. Op. at 12. There indeed were expert witnesses, arguing for the reasonableness of the settlement methodology based on a fixed daily cost and the number of delay-days.  KBR Br. 36.

owed to FKTC, not to meet this court's new and undefined reasonableness standard.

The panel majority concludes that KBR is entitled to no recovery at all, although there was no hearing, no testimony, no briefing, and no argument on the court's new standard—either to clarify this standard, or to provide evidence to which the standard is applied.

Instead, my colleagues cite records not presented for this purpose, and complain of their inadequacy. The various spreadsheets were presented to the ASBCA to support the argument that the methodology that was used was reasonable. There is no record for whatever standard of reasonableness the court now intends.

For example, in the criticized "two pages" on reasonableness in KBR's brief, KBR states that "the record at the ASBCA contained ample evidence upon which it could have calculated a 'fair, equitable and reasonable amount' of compensation" by the jury verdict method. KBR Br. 36. The majority does not mention KBR's evidence "including five delay day models, reports and testimony from multiple expert witnesses and the [Administrative Contracting Officer's] initial, unbridled conclusion that KBR was entitled to recover at least $25.5 million." *Id.* The Administrative Contracting Officer had found that the methodology that was used reflected "commercial procedures" and that "adequate price analysis was provided." ASBCA Op. at 10 (alterations omitted).

Precedent illustrates that when there is question concerning the method of determining compensable costs, this "[does not] mandate that Delco recover nothing." *Delco Elecs. Corp. v. United States*, 17 Cl. Ct. 302, 324 (1989), *aff'd*, 909 F.2d 1495 (Fed. Cir. 1990). The jury verdict method has served to determine an "appropriate amount for a reasonable recovery" that is a fair approximation of damages "in light of all the facts." *Id.* at 323–24. In *Delco* this method was invoked to determine damages in the absence

of adequate cost and pricing data—the issue on which my colleagues now focus.

KBR has requested remand, to provide the opportunity to establish "fair, equitable, and reasonable" compensation. At issue is not only the resolution of this case; at issue is the public's confidence in fair, equitable, and reasonable government dealings with those who are willing to provide their expertise and resources to the nation.

I respectfully dissent.