# United States Court of Appeals for the Federal Circuit

---

**SUPREME FOODSERVICE GMBH,**
*Appellant*

**v.**

**DIRECTOR OF THE DEFENSE LOGISTICS AGENCY,**
*Appellee*

---

2021-1965

---

Appeal from the Armed Services Board of Contract Appeals in Nos. 57884, 57884-QUAN, 58666, 58666-QUAN, 59636, 59636-QUAN, 61361, 61361-QUAN, Administrative Judge J. Reid Prouty, Administrative Judge Michael N. O'Connell, Administrative Judge Richard Shackleford.

---

Decided: December 5, 2022

---

JOHN PRAIRIE, Wiley Rein LLP, Washington, DC, argued for appellant. Also represented by JAMES RYAN FRAZEE.

P. DAVIS OLIVER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY.

---

Before MOORE, *Chief Judge*, PROST and HUGHES, *Circuit Judges*.

HUGHES, *Circuit Judge*.

Supreme Foodservice GmbH appeals an Armed Services Board of Contract Appeals decision concluding that Supreme's contract claims against the government were barred by Supreme's prior material breach. Supreme argues that the government waived its prior material breach defense and seeks Contract Disputes Act interest on money the Board found the government over-withheld. Because we agree that the government did not waive its defense, and because Supreme's prior material breach means there is no valid underlying contractor's claim through which Supreme may recover CDA interest, we affirm.

I

A

In 2005, the Defense Logistics Agency (DLA) awarded a "subsistence prime vendor" (SPV) contract to Supreme to furnish and deliver food to U.S. forces in Afghanistan. Initially, the contract only required Supreme to deliver food by truck to four main U.S. military bases, but DLA later modified the contract to direct Supreme to begin delivering food to other forward operating bases in Afghanistan.

The parties then began negotiating payment for those deliveries to forward operating bases, known as Premium Outbound Transportation (POT). During negotiation, Supreme submitted inflated cost proposals that were, according to Michael Epp, Supreme's Commercial Division Director, "completely false." J.A. 9. Because Supreme threatened to withhold payments to subcontractors (thus potentially cutting off food supply to troops in Afghanistan), the parties executed Modification No. P00010 on August 2, 2006, agreeing to Supreme's proposed rates "subject to final verification." J.A. 13. DLA asked the Defense

Contract Audit Agency (DCAA) to audit Supreme's proposed POT costs. The parties then entered into Modification No. P00012, which provided that DLA would reimburse Supreme at 75 percent of the P00010 rates until the audit was complete.

DCAA performed two audits of Supreme's proposed POT costs and concluded that Supreme's submitted documentation was not adequate to support its proposal. In its second and more-thorough audit, DCAA examined over $602 million in claimed costs and questioned more than $375 million of those costs due to inadequate documentation.

Relying on information uncovered during the audit, the contracting officer (CO) issued a final decision (COFD I) on December 9, 2011, establishing final POT rates that were significantly lower than Supreme's initial, inflated proposed rates. Using the final rates, the CO determined that DLA had overpaid Supreme by $567,267,940 and demanded Supreme return that money. DLA then began withholding money from Supreme's monthly payments, eventually totaling over $540 million. In response, Supreme submitted a "reverse image" claim of the government's December 9, 2011 claim, contending that it was entitled to the proposed rates from the start of performance and that, in total, it was due an additional $1.8 billion dollars. The CO denied that claim (COFD II). Supreme then submitted a second claim seeking $598,769,101. The CO never issued a final decision on that claim. Supreme appealed that deemed denial.

B

In its proposal, Supreme stated that it would get local, market-ready items from Barakat Vegetable and Fruits Co., which would consolidate items at a facility in Dubai and then airlift them to Afghanistan. Supreme later requested that Jamal Ahli Foods Co., LLC (JAFCO) be

approved as an additional place of performance for such items. DLA approved this request in September 2005.

In March 2009, Paul Rigby, a self-described "disgruntled former employee" of Supreme, wrote to the CO and DLA, alleging potentially fraudulent activity surrounding JAFCO. Specifically, he alleged that JAFCO was wholly owned by Supreme, and that when JAFCO would source and consolidate local market ready items, it would include an "undisclosed mark-up" (a 35 percent increase to the purchase price) which increased Supreme's margin to "60ish percent." J.A. 6026; Appellant's Br. 11. DLA then referred the matter to the Defense Criminal Investigation Service, and an investigation followed.

In September 2014, the United States filed a Criminal Information in the Eastern District of Pennsylvania against Supreme, alleging three counts of fraud. Supreme pled guilty to all three counts in December 2014. In its Guilty Plea Agreement, Supreme confirmed that it had devised a scheme to "use JAFCO to make profits over and above the profits made from the Distribution Fees in the SPV Contract by fraudulently increasing the Delivered Price for Local Market Ready . . . goods sold to the United States." J.A. 11087.

Supreme had also sourced bottled water for U.S. forces in Afghanistan. Supreme collected water from various suppliers and then charged the U.S. $6.45 per case, telling the CO that that was the average price it paid. Mr. Epp, Supreme's Commercial Division Director, later testified that water was the most profitable item on the contract because Supreme was actually paying less than $2 per case in some instances. The $6.45 price also included transportation costs, even when the government transported the water. Supreme's guilty plea also acknowledged that it had defrauded the United States by overcharging for bottled water.

In March 2010, Mr. Epp, as relator, filed a *qui tam* complaint against Supreme under the False Claims Act in the Eastern District of Pennsylvania, alleging the fraudulent behavior described above. The United States intervened. The relator provided documents from his time at Supreme to the Assistant U.S. Attorney, who in turn informed DLA that the complaint had been filed and that they had "a fair volume of documents" regarding the fraudulent activity. J.A. 5436. In 2014, Supreme entered into a civil settlement agreement with the relator and the Department of Justice to resolve the *qui tam* action.

C

While the fraud investigations were underway and with Supreme's contract set to expire in December 2010, the parties entered into Modification No. P00092 on December 20, 2010 (the Modification), a two-year extension of the contract. In its Justification for Other than Full and Open Competition Memo regarding the contract extension, DLA explained that "[t]he proposed contract extension is required in order to maintain continuous prime vendor coverage and uninterrupted supply of vitally needed subsistence items, until implementation of the new, competitively awarded prime vendor contract for foodservice support can be put in place." J.A. 11028. The Modification included new distribution prices that specifically covered JAFCO. And in June 2012, after the Department of Defense and the Department of Justice had had more than three years to investigate any fraud but before Supreme had entered any guilty plea, DLA issued a second bridge contract extending Supreme's contract through December 12, 2013.

In January 2015, based on Supreme's December 2014 guilty plea, DLA issued a third CO final decision (COFD III) demanding the return of all money paid under the contract, about $8 billion dollars. Supreme appealed COFD III to the Board.

In October 2017, a fourth CO final decision (COFD IV) updated the debt determination in COFD I regarding the POT rates and duplicated costs. DLA asserted that Supreme owed a total debt of around $350 million. Supreme also appealed that decision to the Board.

D

In May 2020, the Board issued its decision. As to the POT claims, it largely found in DLA's favor, concluding that Supreme had failed to meet its burden of producing evidence of its costs sufficient to justify its proposed POT rates. The Board then considered DLA's affirmative defenses to Supreme's claims. It discussed whether DLA could assert affirmative defenses to a COFD that appears to be its own government claim, rather than a typical contractor claim. The Board concluded that it could address DLA's affirmative defenses because DLA had already withheld about $540 million from Supreme to recoup the overpayments. "Due to the size of the DLA withholding . . . there is a significant possibility that DLA will have to return some money to Supreme. If so, Supreme will be potentially entitled to [Contract Disputes Act] interest on the amounts withheld. This interest, then, would fit into the 'box' of being a contractor claim and, as such, would be subject to DLA's affirmative defenses." J.A. 55. Thus, the Board concluded that it could address DLA's affirmative defense that Supreme's fraud was a prior material breach barring recovery of CDA interest.

Supreme argued that DLA waived its affirmative defense by continuing to contract with Supreme even after it first learned of Supreme's fraud. Even though DLA "had ample evidence of Supreme's extensive fraud" by June 2010, yet still continued with its contract, the Board held that DLA had not waived its affirmative defense of first material breach because it did not continue the contract after Supreme pled guilty. J.A. 56–58. The Board based its decision on our prior decision in *Laguna Construction*

*Company, Inc. v. Carter*, where we held that the government could not waive its prior material breach defense until it had a "known right" to the defense—i.e., when a contractor pled guilty to fraud. 828 F.3d 1364, 1369 (Fed. Cir. 2016). The Board also rejected Supreme's contention that DLA's prior material breach defense did not apply to the bridge contract from 2012–2013 because "the SPV and bridge contracts were inextricably intertwined for POT purposes and the parties treated them as such." J.A. 60. The Board concluded that Supreme committed the first material breach and had lost its right to CDA interest.

Supreme moved for reconsideration of the Board's decision, arguing that the Board treated CDA interest as a contractual entitlement, rather than a statutory one. The Board denied the motion. It agreed with Supreme "that CDA interest is a statutory right on a valid claim," but concluded that "Supreme's prior material breach through its commission of fraud bars its claim for interest." J.A. 80. The parties subsequently agreed upon quantum amounts, and the Board adopted them.

Supreme now appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(10).

## II

Our review of the Board's decision is limited by statute. We review the Board's legal conclusions de novo, but we may not set aside a factual finding unless it is "(A) fraudulent, arbitrary, or capricious; (B) so grossly erroneous as to necessarily imply bad faith; or (C) not supported by substantial evidence." 41 U.S.C. § 7107(b)(2); *Kellogg Brown & Root Servs., Inc. v. Sec'y of the Army*, 973 F.3d 1366, 1370 (Fed. Cir. 2020). Contract interpretation is a question of law reviewed without deference. *Kellogg Brown & Root Servs., Inc.*, 973 F.3d at 1370. The appellant bears the burden of establishing reversible error. *See Fernandez v. Dep't of the Army*, 234 F.3d 553, 555 (Fed. Cir. 2000).

III

A

Supreme argues that DLA waived its prior material breach defense by continuing with performance of the contract even after learning of Supreme's fraudulent behavior.

Under the doctrine of prior material breach, "when a party to a contract is sued for breach, it may defend on the ground that there existed a legal excuse for its nonperformance at the time of the alleged breach." *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1380 (Fed. Cir. 2004) (citing *Coll. Point Boat Corp. v. United States,* 267 U.S. 12, 15 (1925)). "The government may use the prior material breach doctrine to defeat a contractor's breach claim." *Laguna*, 828 F.3d at 1371.

The Board held that DLA did not waive its prior material breach defense based on our decision in *Laguna.* J.A. 56–57. In *Laguna,* the government learned of a kickback scheme in January 2008 on a construction contract where physical work was not complete until 2010. *Laguna,* 828 F.3d at 1366. The government obtained its first guilty plea from one of Laguna's project managers in October 2010. *Id.* The parties continued with "conducting audits and making cost reimbursements" after the completed physical work in 2010. *Id.* at 1372. The government did not raise its first material breach defense to the contractor's claim until after a final guilty plea by a Laguna senior executive in 2013. *Id.* at 1367. Laguna argued that the government's "continued performance" of paying incurred costs and auditing Laguna's statements, even after the government knew of the kickback scheme, constituted waiver of the prior material breach defense.

We held that "[i]t was reasonable for the government to invoke the prior material breach rule after [the senior executive] entered a guilty plea in July 2013," even though it had some notice of criminal conduct as early as 2008,

because prior to the plea, "the government did not have a 'known right' that would have invoked the prior material breach rule." *Id.* at 1372. Thus, the actions the government took in continuing with the contract after 2008 still "did not waive [the government's] right to invoke the prior material breach rule." *Id.*

*Laguna* applies squarely to the facts of this case. Because waiver "is an intentional relinquishment or abandonment of a known right," *Massie v. United States*, 166 F.3d 1184, 1190 (Fed. Cir. 1983), DLA cannot have waived its defense prior to Supreme's December 2014 guilty plea because it did not have a known right until Supreme finally entered that guilty plea, conclusively ending the criminal investigation into its fraud. Even though DLA had some notice of Supreme's fraudulent behavior beginning in 2009, it had no "known right" until Supreme's guilty plea. And DLA never extended Supreme's contract after Supreme pled guilty. Accordingly, we affirm the Board's conclusion that DLA did not waive its affirmative defense of prior material breach.

B

Supreme next argues that, even if we conclude that DLA did not waive its affirmative defense, we should still determine that Supreme is entitled to CDA interest on money the government over-withheld. The CDA provides that "[i]nterest on *an amount found due a contractor on a claim* shall be paid to the contractor for the period beginning with the date the CO receives *the contractor's claim*, pursuant to section 7103(a) of this title, until the date of payment of the claim." 41 U.S.C. § 7109(a)(1) (emphases added). Typically, this provision entitles a contractor to interest on its own successful claim. But here, there is no such successful claim. Although the Board concluded that the government had over-withheld approximately $143 million when addressing the *government's* claim, the Board terminated *Supreme's* claims based on the government's

prior material breach defense. Supreme seeks interest on that over-withheld amount related to the government's claim, despite the fact its own claims did not prevail.

In Supreme's view, this statutory language has only two requirements for a contractor to be entitled to interest: (1) that a contractor is owed a monetary recovery on *any* claim (an "amount found due"), and (2) that the contractor submitted its own certified claim to the CO ("on a claim"). Appellant's Reply Br. 31. Under this view, it is enough for the contractor to simply submit its own claim—it need not prevail on that claim. Thus, Supreme argues that it is entitled to recover interest on the $143 million that the Board found Supreme is owed from the money DLA withheld, beginning from the date Supreme submitted its own certified claim to the CO. Appellant's Br. 61. We must decide whether the CDA requires a contractor to successfully prevail on its own claim to be entitled to interest; or whether interest may be assessed on any monetary recovery owed for which the contractor submitted a certified claim, regardless of how unsuccessful that claim may be.

To answer this question, we look to the statutory text:

> Interest on *an amount found due a contractor on a claim* shall be paid to the contractor for the period beginning with the date the contracting officer receives *the contractor's claim*, pursuant to section 7103(a) of this title, until the date of payment of the claim.

41 U.S.C. § 7109(a)(1) (emphases added). This language is clear—the "claim" for which a contractor is owed interest is "the *contractor's* claim." *Id.* (emphasis added). Nothing in this provision grants a contractor the right to receive interest on an amount due under the *Government's* claim. *See Ruhnau-Evans-Ruhnau Assocs. v. United States*, 3 Cl. Ct. 217, 219 (1983) ("[W]here an award of interest against the government is at issue, such congressional silence cannot be read as an affirmative grant."). Rather, it is obvious that

a contractor must be successful on *its own claim* to be entitled to interest under the CDA.

Supreme relies on a non-precedential decision, *Secretary of the Army v. Kellogg Brown & Root Services*, 779 F. App'x 716 (Fed. Cir. 2019), to argue that a claim alone is all that is required to recover interest. In *Kellogg*, the contractor, KBR, brought three certified CDA claims between 2007 and 2010, seeking to recover a total of $44 million that the Army had withheld. *Id.* at 722. In September 2011, KBR brought a fourth certified CDA claim for that same $44 million plus interest under the CDA. *Id.* at 718. In the 2011 claim, KBR alleged a new legal theory for recovering the $44 million plus interest. *Id.* Although KBR's original legal theories did not prevail, KBR was ultimately successful on its 2011 legal theory and was awarded $44 million plus interest. *Id.* at 722. The issue on appeal was whether the clock for calculating interest on the $44 million recovery began when the claims for that $44 million were first made, or if it began when the prevailing legal theory was first raised. We concluded that the Board did not err in starting the interest clock as of the 2007 to 2010 claims, even though KBR's prevailing legal theory was not raised until the September 2011 claim. *Id.*

*Kellogg* is distinguishable from the circumstances here. This case does not ask what event triggers the interest clock, but whether a contractor is *at all* entitled to CDA interest if it has not prevailed on its own claim. "The purpose of the [CDA] interest provision . . . is to provide 'interest to the contractor upon a *favorable decision* on *his claim*. . . .'" *Esprit Corp. v. United States*, 6 Cl. Ct. 546, 548 (1984) (emphases added) (quoting S. Rep. No. 95-1118, at 32 (1978)). While KBR received a favorable decision on its own claim in *Kellogg*, Supreme has received no favorable decision here. Rather, Supreme's claims failed because of the Army's successful affirmative defense. If anything, Supreme's circumstances are more analogous to the cases that *Kellogg* distinguished and recognized "stand for the

proposition that defenses to government claims alone are not entitled to CDA interest." *Kellogg*, 779 F. App'x at 722–23 (citing, e.g*., Magnus Pac. Corp. v. United States*, 133 Fed. Cl. 640 (2017) ("[T]he CDA awards interest on successful *contractor claims* denied by a contracting officer, not on successful *appeals* of government claims." (emphases in original))). Supreme's prior material breach, through its commission of fraud, bars its claim for payment for both the underlying amount and any interest that might otherwise have been due. We affirm the Board's denial of CDA interest.

C

Finally, Supreme argues that DLA's first material breach defense cannot apply to the two subsequently awarded contract extensions covering 2010–2012 and 2012–2013. It contends that those are separate contracts it did not breach and that it therefore should be able to recover CDA interest on the amounts DLA over-withheld during the periods of those two contracts. Appellant's Br. 66. The crux of its argument is that its actions that constituted the material breach (i.e., the JAFCO and bottled water fraud) all occurred before DLA awarded the first contract extension in December 2010, and therefore Supreme never breached the 2010–2012 or the 2012–2013 contracts.

The Board concluded that the first contract extension, from 2010–2012, was clearly not a separate contract because it was implemented through a bilateral modification to the original contract, despite later references to the extension as a bridge contract. J.A. 41, 59. We agree with that conclusion—the agreement is clearly styled and executed as a modification. *See* J.A. 4257 (agreement entitled "Amendment of Solicitation/Modification of Contract"). Thus, DLA's prior material breach defense applies to the 2010–2012 extension of the parties' original contract.

The Board also concluded, and the government does not dispute, that the final extension from 2012–2013 is a bridge contract, not an extension. J.A. 59. But the Board found that the original SPV contract and the bridge contract "were inextricably intertwined for POT purposes and the parties have treated them as such." J.A. 60. Specifically, the bridge contract increased POT rates by 4.5 percent, but otherwise was very similar to the original contract—incorporating by reference all the terms, conditions, and modification of the original contract, and providing that unresolved claims and requests for equitable adjustments were not affected by the bridge contract. J.A. 59. Furthermore, the Board pointed out that "if the bridge contract were treated as a separate contract, Supreme would need to prove its costs during that contractual period, but it has not done so. It would not be consistent (or fair) to allow Supreme to treat the contracts as separate for purposes of DLA's affirmative defenses but one and the same for purposes of proving its costs." J.A. 60.

We agree that we should not allow Supreme to treat the bridge contract as separate only when it attempts to evade the government's affirmative defenses. The parties treated the original contract and the bridge contract as inextricably intertwined, and so we shall too. We conclude that DLA's prior material breach defense applies to the 2012–2013 bridge contract as well.

IV

We have considered Supreme's remaining arguments but find them unpersuasive. For the foregoing reasons, we affirm.

**AFFIRMED**