DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Supreme Foodservice GmbH | ) ASBCA No. 61370 |
| | ) |
| Under Contract No. SPM300-05-D-3130 | ) |

APPEARANCES FOR THE APPELLANT: John R. Prairie, Esq.
J. Ryan Frazee, Esq.
Bryan T. Bunting, Esq.
Sarah B. Hansen, Esq.
Jennifer Eve Retener, Esq.
  Wiley Rein LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT: Daniel K. Poling, Esq.
  DLA Chief Trial Attorney
Kelly L. Diaz-Albertini, Esq.
Lindsay A. Salamon, Esq.
Anne P. Steel, Esq.
Ryan P. Hallisey, Esq.
Stacey E. Hirsch, Esq.
Robert L. Kieffer, Esq.
Lindsey R. Mossor, Esq.
  Trial Attorneys
  DLA Troop Support
  Philadelphia, PA

OPINION BY ADMINISTRATIVE JUDGE O'CONNELL ON APPELLANT'S
MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMARY JUDGMENT

Appellant, Supreme Foodservice GmbH (Supreme) moves for judgment on the pleadings or, in the alternative, for summary judgment on the claim of the Defense Logistics Agency – Troop Support (DLA) for the recovery of performance-based distribution fees. For the reasons stated below, we grant Supreme's motion.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. This contract has been the subject of extensive litigation between the parties, including 47 appeals dating back to December 2011. The Board and the Federal Circuit

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

have issued a total of nine published decisions. We will reference the decisions that are relevant to the pending motion. First, in 2016, the Board issued a decision on the parties' cross motions for summary judgment on the 36 appeals that were then pending. Among other things, the Board granted Supreme's motion that the government had released certain claims in a district court False Claims Act settlement with Supreme. *Supreme Foodservice GmbH*, ASBCA No. 57884, *et al.*, 16-1 BCA ¶ 36,387 at 177,394-95 (*Supreme I*).

2. Second, in 2019, the Board conducted a one-month hearing on Supreme's claims related to Premium Outbound Transportation. The Board issued a decision, *Supreme Foodservice GmbH*, ASBCA Nos. 57884, *et al.*, 20-1 BCA ¶ 37,618 (*Supreme II*), that the Federal Circuit affirmed. *Supreme Foodservice GmbH v. Dir. of the Def. Logistics Agency*, 54 F.4th 1362 (Fed. Cir. 2022) (*Supreme III*). Our decision in *Supreme II* contains extensive findings of fact relevant to the pending motion, particularly with respect to Supreme's fraud, the subsequent criminal charges and False Claims Act cases, and the parties' settlement of those matters. *Supreme II* at findings 75-76, 193-223. We will restate only what is necessary for this opinion.

3. These appeals arise from a commercial items contract to furnish and deliver food in Afghanistan that DLA awarded to Supreme on June 3, 2005. *Supreme II* at findings 1, 22. DLA paid Supreme based on a Unit Price that had two components: the Delivered Price, which was the invoice price for the supplier to deliver the food to Supreme, and the Distribution Fee, which contained all other costs, including general and administrative expenses, overhead, profit, packaging, and the cost of transport. *Supreme II* at findings 24, 156.

4. There was one wrinkle to this pricing scheme that we did not discuss in *Supreme II:* the Distribution Fees were performance based (PBDF), meaning that the fees could be increased by 5% or decreased up to 10% based on Supreme's performance. The PBDF was based on the contractor's "fill rate," which was the number of cases accepted, divided by the number ordered, and its Contractor Performance Assessment Report (CPAR) rating. (R4, tab 5 at 2-3)[1]

5. Increases or decreases to the PBDFs were based on the following adjectival ratings:

> **Excellent** – 5% increase. A fill rate of 97.51% or higher and a CPAR rating of "would definitely" award to this contractor today if the contracting officer (CO) had the choice.

---

[1] Citations are to the .pdf page number of the electronic file.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

**Good** – No change. A fill rate of 96.50% or higher and a
CPAR rating of "would definitely" award to this contractor
today if the CO had the choice.

**Fair** – 5% decrease. A fill rate of 96.50% or less or a CPAR
rating of "probably would not" award to this contractor today
if the CO had the choice.

**Poor** – 10% decrease. A fill rate of 96.50% or less and a
CPAR rating of "probably would not" or "would not" award
to this contractor today if the CO had the choice.

(R4, tab 5 at 3)

6. For the CPARS rating period December 13, 2005 to June 11, 2006, Supreme received a Good PBDF rating based on a fill rate of 98.5% and a "probably would award" CPAR rating, which meant that Supreme received standard distribution fees that amounted to $25,988,286.73. (App. mot., ex. 4 at 2)

7. For the CPARS rating period June 12, 2006 through December 11, 2006, Supreme received a CPARS rating of "definitely would award" and an Excellent PBDF rating. Accordingly, the standard Distribution Fees of $38,341,499.21, increased by an additional 5% ($1,917,075). (App. mot., ex. 4 at 2)

8. For the CPARS rating period December 12, 2006 to June 30, 2007, Supreme received a CPARS rating of "definitely would award" and an Excellent PBDF rating. The standard Distribution Fee of $28,297,751.68 increased by 5% ($1,414,888). (App. mot., ex. 4 at 2-3)

9. For the CPARS rating period from July 1, 2007 to December 31, 2007, Supreme received a CPARS rating of "definitely would award" and an Excellent PBDF rating. The standard Distribution Fee of $44,160,325.35 increased by 5% ($2,208,016). (App. mot., ex. 4 at 3)

10. For the CPARS rating period from January 1, 2008 to June 30, 2008, Supreme received a CPARS rating of "definitely would award" and an Excellent PBDF rating. The standard Distribution Fee of $37,728,992.63 increased by 5% ($1,886,450). (App. mot., ex. 4 at 3)

11. For the CPARS rating period from July 1, 2008 to December 31, 2008, Supreme received a CPARS rating of "definitely would award" and an Excellent PBDF rating. The standard Distribution Fee of $72,493,388.24 increased by 5% ($3,624,669). (App. mot., ex. 4 at 3)

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

12.  For the CPARS rating period from January 1, 2009 through June 30, 2009, Supreme had a fill rate of 98.81% but its CPARS rating was reduced to "probably would award."  As a result, Supreme received a Good PBDF rating.  There was no change to the Distribution Fee of $74,120,879.52.  (App. mot., ex. 4 at 3-4)  Perhaps not coincidentally, this reduction of the CPARS ratings from the previous "definitely would award" and the consequent cessation of the 5% increases occurred during the period of time in which DLA received the fraud accusation that ultimately led to the criminal and False Claims Act cases.  *Supreme II* at findings 196-98.

13.  For the CPARS rating period of July 1, 2009 to December 31, 2009, Supreme received a CPARS rating of "probably would award" and a Good PBDF rating.  The standard Distribution Fee of $129,737,549.85 did not increase.  (App. mot., ex. 4 at 4)

14.  For the CPARS rating period of January 1, 2010 to June 30, 2010, Supreme received a CPARS rating of "probably would award" and a Good PBDF rating.  The standard Distribution Fee of $122,239,741.92 did not increase.  (App. mot., ex. 4 at 4)

15.  For the CPARS rating period of July 1, 2010 to December 19, 2010, Supreme received a CPARS rating of "probably would award" and a Good PBDF rating.  The standard Distribution Fee of $192,328,153.67 did not increase.  (App. mot., ex. 4 at 4)

16.  In September 2014, Supreme agreed to plead guilty to "major fraud" against the United States, conspiracy to commit "major fraud," and wire fraud (compl. ¶¶ 26-33; app. mot., ex. 2); *Supreme II* at finding 203.  The guilty plea agreement incorporated as attachment B a statement of facts that summarized two offenses committed by Supreme.  First, Supreme used a related company known as JAFCO to fraudulently increase the Delivered Prices for what were referred to as Local Market Ready (LMR) goods to make profits over and above those in the Distribution Fees.  Second, Supreme fraudulently increased the price of bottled water delivered to the government.  (App. mot., ex. 2, attach. B at 2-3); *Supreme II* at findings 204-212.

17.  Supreme and a related company agreed to pay $250 million to the United States consisting of: a forfeiture of $10 million; fines totaling $192 million, and $48 million in restitution.  In addition, Supreme agreed to pay DLA a reconciliation of $38,362,198.71 related to cases of water delivered during the period from March 2007 to December 2013.  *Supreme II* at finding 213.

18.  In December 2014, Supreme and the United States agreed to settle the False Claims Act case filed by Michael Epp, the former director of Supreme's Commercial Division, who had been one of the primary architects of the fraud.  Supreme agreed to pay the government an additional $101 million.  (Compl. ¶ 34; *Supreme II* at findings 33, 217).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

19. The settlement agreement in the False Claims Act case (the FCA settlement agreement) has several provisions relevant to the pending motion (app. mot., ex. 3). First, Recital D of the agreement defined the "Covered Conduct" as:

> 1. Falsely representing the invoiced price a related entity, Jamal Ahli Foods Co., LLC ("JAFCO"), charged for the purchase of [LMR] items as the "Delivered Price" within the meaning of that term under the Prime Vendor Contract, rather than the lower price invoiced to JAFCO by manufacturers and suppliers of LMR items during the period July 2005 through April 1, 2009;
>
> 2. Falsely representing invoiced prices of bottled water as the "Delivered Price" within the meaning of that term under the Prime Vendor Contract, rather than the actual lower priced water invoiced to Supreme from bottled water vendors during the period December 2005 through April 2007; and
>
> 3. Obtaining from various vendors located in the United States certain discounts and rebates that failed to disclose or pass through to [DLA], as required by the Prime Vendor Contract, by falsely characterizing such discounts and rebates as discounts for prompt payments and marketing allowances when, in fact, some of them were not, during the period from June 2005 to December 2010.

(*Id.* at 2-3)

20. The first two categories of Covered Conduct are the same actions cited in the guilty plea agreement in the criminal case (SOF 16; gov't resp. at 7 ("The settlement agreement referenced the two fraud schemes described in the Statement of Facts of the Guilty Plea Agreement")).

21. In paragraph 4 of the terms and conditions of the FCA settlement agreement, the government provided the following release to Supreme:

> 4. Subject to the exceptions in Paragraph 6 below (concerning excluded claims, counterclaims, and affirmative defenses) . . . the United States releases Supreme . . . from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, . . . the Contract Disputes Act, 41 U.S.C. §§ 7101-7109; or the

5

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

common law theories of breach of contract, payment by mistake, unjust enrichment, and fraud.

(App. mot., ex. 3 at 4)

22. Paragraph 6 delineated limited exceptions to the release:

> 6. Notwithstanding the releases given in Paragraphs 4 and 5 of this Agreement, or any other term of this agreement, the following claims, counterclaims and affirmative defenses of the United States are specifically reserved and are not released:
> . . .
>
> (c) Except as explicitly stated in the Agreement, any administrative liability, including the suspension and debarment rights of any federal agency;
>
> (d) Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct, including the claims and affirmative defenses of the United States set forth in the *Appeal of Supreme Foodservice GmbH, Under Contract No. SPM300-05-D-3130*, ASBCA Nos. [listing 26 appeals pending at that time], and any other administrative contract claims with respect to the Prime Vendor Contract that the United States has asserted, could have asserted, or may assert in the future against Supreme under the Contract Disputes Act
> . . .

(App. mot., ex. 3 at 5-6)

23. More than 34 months later, on October 11, 2017, CO Lourdes Valentin issued a final decision seeking to recoup a portion of the Distribution Fees, citing "Supreme's guilty plea in U.S. District Court to, among other misconduct, major fraud against the United States" (app. mot., ex. 4 at 1-2). CO Valentin changed each of the CPARS ratings cited above from "probably would award" or "definitely would award" to "would not award." She also changed the PBDF adjectival ratings from Excellent or Good to Fair. The result of this was that, for every rating period that Supreme had received a 5% increase due to the Excellent rating, CO Valentin rescinded those increases. In addition, she decreased the Distribution Fee by 5% for each of the periods due to the downgrade in the PBDF rating to Fair. CO Valentin calculated that Supreme owed the government $49,322,986. (*Id.* at 2-4)

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

24.  Supreme filed an appeal two days later, on October 13, 2017.

25.  On March 30, 2020, DLA filed a complaint[2] with three counts entitled: Overpayments, Breach of Contract – Failure to Pay DLA for Amounts Owed, and Breach of Duty of Good Faith and Fair Dealing.

DECISION

I.       Standard of Review

In a motion for judgment on the pleadings, the Board applies the same standard as in a motion for failure to state a claim. *Unitech Services Grp., Inc.*, ASBCA No. 56482, 10-1 BCA ¶ 34,362 at 169,695. In considering a motion to dismiss for failure to state a claim, the Board may consider judicially noticeable matters outside the pleadings without converting the motion to one for summary judgment. *CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1360 (Fed. Cir. 2019) (citing *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999), *overruled on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002)). In *Jackson*, the Sixth Circuit stated that consideration of documents outside the pleadings generally requires conversion of the motion to one for summary judgment. The Court noted that there are exceptions to this rule, including that documents "attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Jackson*, 194 F.3d at 745. Further, a tribunal may "consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies." *Id.*

DLA's complaint cites and relies upon the contract, and, specifically, the provisions related to PBDF (compl. ¶¶ 16-21), Supreme's fraud, the guilty plea, and the FCA settlement (*id.* ¶¶ 26-34), and the CO's final decision (*id.* ¶¶ 45-48). The guilty plea, the FCA settlement agreement, and the CO's final decision are attached to Supreme's motion and are integral to DLA's claim. There is no dispute about their authenticity by either party, and neither party has objected to their consideration in this motion. Accordingly, the Board may consider them in deciding Supreme's motion for judgment on the pleadings.

---

[2] Though this appeal was brought by Supreme, the claim was brought by the government. In such instances, the Board often requires the complaint to be submitted by the government as we did here.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

II.     DLA Released Its CDA Claims Related to the Fraud

A.  DLA Released the Claim Under Paragraph 4 of the Settlement Agreement

Supreme contends that the government released any claims arising from the fraud in the FCA settlement agreement, including DLA's PBDF claim. In a release, which is contractual in nature, a party abandons a claim or relinquishes a right that it could assert against another. *Holland v. United States*, 621 F.3d 1366, 1377 (Fed. Cir. 2010). A release "is interpreted in the same manner as any other contract term or provision," *Bell BCI Co. v. United States*, 570 F.3d 1337, 1341 (Fed. Cir. 2009), which is to say that it is interpreted as a whole, to harmonize and give a reasonable meaning to all of its parts. *See NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).

The Board considered a comparable DLA claim against Supreme in ASBCA No. 59811. *Supreme I*, 16-1 BCA ¶ 36,387 at 177,394. In that appeal, the Board considered a claim issued in a January 30, 2015 CO's final decision. Thus, both ASBCA No. 59811 and the present matter arose from final decisions issued after the criminal and FCA settlements. In the final decision that was the subject of ASBCA No. 59811, the CO contended that the contract was void *ab initio* and that DLA was entitled to a refund of more than $8.2 billion in contract payments. As in the present matter, the CO based this contention on Supreme's guilty plea to major fraud. The Board disagreed, holding that this was a claim based on the Covered Conduct, which the government had released in paragraph 4 of the FCA settlement agreement. *Id.*; (*see also* SOF 19); *Supreme II* at finding 221. In the Board's subsequent decision in *Supreme II*, the Board rejected DLA's remaining contentions that the contract was void *ab initio*. *Supreme II*, 20-1 BCA ¶ 37,618 at 182,636-37. The government did not appeal our decision in ASBCA No. 59811 and it is now final and binding on DLA.[3]

The Board reaches the same conclusion in this appeal. As in ASBCA No. 59811, the CO identified Supreme's guilty plea as the basis for DLA to recoup money from Supreme above and beyond the nearly $390 million recovered in the district court settlements (SOF 23); *Supreme II* at finding 221. The matters covered by the guilty plea agreement were the same actions or events identified in the Covered Conduct, namely the JAFCO and bottled water fraud (SOF 20). To be sure, the CO's final decision does not mention JAFCO or bottled water fraud. DLA seizes on this to suggest that the CO had reasons other than the fraud for lowering the CPAR ratings (gov't resp. at 12). If she did, she failed to mention them in the final decision. By contrast, we count 11 references to

---

[3] While the present matter involves the same parties, the same contract, the same fraud, the same FCA settlement agreement, and a very similar DLA claim, Supreme has not formally contended that DLA is barred from relitigating this issue based on collateral estoppel. *See, e.g.*, *Biafora v. United States*, 773 F.3d 1326, 1333 (Fed. Cir. 2014).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

the guilty plea for fraud as the basis for her decision (app. mot., ex. 4 at 1-4). Thus, it is crystal clear that the terms "guilty plea," Covered Conduct, and JAFCO and bottled water fraud all mean the same thing.

In paragraph 4 of the FCA settlement agreement, the government released Supreme "from any civil or administrative monetary claim the United States has for the Covered Conduct under . . . the Contract Disputes Act, 41 U.S.C. §§ 7101-7109 . . ." (SOF 21). Because DLA is clearly asserting a monetary claim under the Contract Disputes Act (CDA) for the Covered Conduct, the Board holds that DLA has released the PBDF claim.

B. <u>DLA Misreads the Exceptions to the Release</u>

DLA makes several arguments to avoid the release. Generally, DLA construes the release narrowly, and the exceptions broadly. DLA seems to contend that only a narrow category of claims in which the CO directly assessed a penalty for the fraud would be barred. In DLA's view, simply adding an intermediate step, by first lowering the CPAR ratings based on the fraud, and then demanding repayment, is enough to escape the release. The Board disagrees. Such a ruling would be inconsistent with our precedent in ASBCA No. 59811 in which there was a comparable intermediate step: using the fraud to declare the contract void *ab initio*, and then citing the void contract to demand repayment. *Supreme I*, 16-1 BCA ¶ 36,387 at 177,394. We rejected the argument then and reject it again now because it would strip the release of almost any meaning.

DLA also contends that its claim is preserved because paragraph 6(c) of the FCA settlement agreement excepts "any administrative liability, including the suspension and debarment rights of any federal agency" (SOF 22). DLA contends that this enabled it to revise Supreme's CPAR rating (gov't resp. at 13-14). But the sentence that DLA relies on begins by stating "[e]*xcept as explicitly stated* in the Agreement, any administrative liability . . ." (SOF 22 (emphasis added)). CDA claims for the Covered Conduct were explicitly released. Thus, the exception for administrative liability has no relevance to this claim. In context, paragraph 6(c) clearly is referring to administrative matters outside of the CDA, such as debarment proceedings. *See Henry Stranahan*, ASBCA No. 58392, 13 BCA ¶ 35,312 at 173,356 (Board lacks jurisdiction to consider suspension or debarment orders).

Finally, DLA goes so far as contending that "changing the CPAR rating is a purely administrative action and does not arise from the Covered Conduct listed in the settlement agreement" (gov't resp. at 14). This is factually incorrect. As we have already stated, the CO made it very clear in her decision that she was changing the CPAR ratings due to the Covered Conduct. The CO's final decision states "[b]ased on Supreme's guilty plea in U.S. District Court to . . . major fraud . . . I hereby change the CPARS for

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

the period December 13, 2005 through June 11, 2006 to 'would not award'" (*see* SOF 23).  The CO repeats this nine further times for the other CPAR rating periods.

### C.  Other DLA Arguments

DLA makes two further arguments driven by similar logic that we reject for similar reasons.  DLA contends that it overpaid the PBDF because it did not know about the fraud, and, thus, made the payments "in error."  DLA then cites the noncontroversial principle that when the government makes overpayments it is entitled to recover them.  (Gov't resp. at 15-16)  We reject this argument because the FCA settlement agreement not only released CDA claims for the Covered Conduct, but also the common law theory of payment by mistake (SOF 21).

In a similar vein, DLA contends that Supreme violated the duty of good faith and fair dealing when it committed fraud (gov't resp. at 17-19).  This in no way affects our analysis above.  The claim has been released.

### CONCLUSION

The Board grants Supreme's motion.  The appeal is sustained.

Dated:  March 25, 2024

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61370, 59419, 59420, 59615, 59618, 59619, 59675, 59676, 59683, 59830, 59863, 59867, 59872, 59879, 60024, 60250, 60309, 60365, 60832, 61069, 61294, 61319, Appeals of Supreme Foodservice GmbH, rendered in conformance with the Board's Charter.

Dated:  March 25, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals