ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Wolverine Tube, Inc. | ) ASBCA No. 63877 |
| | ) |
| Under Contract No. FA8534-21-D-0002 | ) |

APPEARANCE FOR THE APPELLANT:    Bret S. Wacker, Esq.
    Clark Hill PLC
    Detroit, MI

APPEARANCES FOR THE GOVERNMENT:    Caryl A. Potter, III, Esq.
    Air Force Deputy Chief Trial Attorney
    Christopher J. Hilborn, Esq.
    Hector M. RiveraHernandez, Esq.
    Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE LAUFGRABEN ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT ON ENTITLEMENT

This case arises from the convenience termination of an Air Force contract to supply air cargo pallets. Appellant, Wolverine Tube, Inc. (Wolverine), brought this appeal to recover convenience termination costs that were denied by the Air Force because they were incurred after Wolverine received a stop-work order. Wolverine contends that the costs are allowable because the stop-work order expired before Wolverine incurred them. Both parties have filed cross-motions for summary judgment on entitlement. For the reasons set forth below, we grant Wolverine's summary judgment motion, in part, and deny it, in part. We deny the Air Force's cross-motion.

STATEMENT OF FACTS FOR PURPOSES OF THE CROSS-MOTIONS

I. The Pallet Contract

1. On May 18, 2021, the Air Force awarded Contract No. FA8534-21-D-0002 (Pallet Contract) for the manufacture and delivery of air cargo pallets to Wolverine (jt. stip. of facts (JSF) ¶ 2). The Pallet Contract is an Indefinite Delivery Requirements contract under FAR 16.503 (R4, tab 1 at 3). The Pallet Contract included a Base Contract Period with an 18-month performance period followed by eight 12-month options and one 6-month option (app. stmt. of facts (SOF) ¶ 4).

2. The Pallet Contract required Wolverine to manufacture and deliver six "first articles" for testing by the Air Force within 365 days of award—i.e., by May 18, 2022

(R4, tab 1 at 68 (incorporating in full FAR 52.209-4, FIRST ARTICLE APPROVAL – GOVERNMENT TESTING (SEP 1989))).  The purpose of a first article test is to ensure "that the contractor can furnish a product that conforms to all contract requirements for acceptance."  FAR 9.302.

3.  In accordance with FAR 52.209-4(h), the Pallet Contract cautioned Wolverine against purchasing materials or components for production before obtaining approval of its first articles:

> Before first article approval, the acquisition of materials or components for, or the commencement of production of, the balance of the contract quantity is at the sole risk of the Contractor.  Before first article approval, the costs thereof shall not be allocable to this contract for (1) progress payments, or (2) termination settlements if the contract is terminated for the convenience of the Government.

(R4, tab 1 at 68)

4.  The Pallet Contract structured performance requirements by a series of contract line-item numbers (CLINs) (*id.* at 3-57).  CLIN 0001 and CLIN 0002 related to first article testing.  Under CLIN 0001, the Pallet Contract specified that the Air Force would pay $3,000 for each first article delivered for a total of $18,000.  Under CLIN 0002, Wolverine would be paid $17,391,000 for Non-Recurring First Article Costs "**ONLY AFTER** approval of first article."  (*Id.* at 4-5) (emphasis in original)

5.  For orders placed under the Pallet Contract, the Pallet Contract included a Best Estimated Quantity (BEQ) for each option period, which represented "the estimated quantity the Government expects to order" during that period (R4, tab 1 at 3).  The BEQs ranged from 10,000–15,000 pallets per year (*id.* at 8 11, 23, 29, 34, 40, 46, 52).

6.  The Pallet Contract also provided that, "[i]n accordance with DFARS 252.217-7001(a)(l), Surge Option (Dec 2018), the Government has the option to increase the quantity of supplies or services called for under this contract IAW SOW paragraph 3.6.1.2.3, Surge Requirements" (R4, tab 1 at 3).  Thus, starting in the second option period, Wolverine "shall be able to attain capacity for a surge order quantity of up to 50,000 pallets per year, with the expected delivery of all units within 365 days from the date of order" (*id.* at 16).

7.  The Pallet Contract incorporated by reference two FAR provisions that permitted the government to stop work:  FAR 52.242-15 and FAR 52.233-3 (*id.* at 59, 84).  The first provision, FAR 52.242-15, STOP-WORK ORDER (AUG 1989), provides:

2

(a)  The Contracting Officer may, at any time, by written order to the Contractor, require the Contractor to stop all, or any part, of the work called for by this contract for a period of 90 days after the order is delivered to the Contractor, and for any further period to which the parties may agree.  The order shall be specifically identified as a stop-work order issued under this clause.  Upon receipt of the order, the Contractor shall immediately comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage.  Within a period of 90 days after a stop-work order is delivered to the Contractor, or within any extension of that period to which the parties shall have agreed, the Contracting Officer shall either—

> (1)  Cancel the stop-work order; or

> (2)  Terminate the work covered by the order as provided in the Default, or the Termination for Convenience of the Government, clause of this contract.

(b)  If a stop-work order issued under this clause is canceled or the period of the order or any extension thereof expires, the Contractor shall resume work.

FAR 52.242-15(a)-(b).

8.  The second provision, FAR 52.233-3, PROTEST AFTER AWARD (AUG 1996), applies to stopping work in connection with a bid protest:

> Upon receipt of a notice of protest (as defined in FAR 33.101) or a determination that a protest is likely (see FAR 33.102(d)), the Contracting Officer may, by written order to the Contractor, direct the Contractor to stop performance of the work called for by this contract.  The order shall be specifically identified as a stop-work order issued under this clause.  Upon receipt of the order, the Contractor shall immediately comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage.  Upon receipt of the final decision in the protest, the Contracting Officer shall either—

3

(1)  Cancel the stop-work order; or

(2)  Terminate the work covered by the order as provided in the Default, or the Termination for Convenience of the Government, clause of this contract.

FAR 52.233-3(a).

9.  The Pallet Contract also incorporated by reference FAR 52.249-2, TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (APR 2012) (R4, tab 1 at 86).  The provision encourages the parties to agree on the terms of a convenience termination settlement; however, if the parties cannot reach an agreement, FAR 52.249-2 provides that contractor is entitled to the following costs:

(1)  The contract price for completed supplies or services accepted by the Government (or sold or acquired under paragraph (b)(9) of this clause) not previously paid for, adjusted for any saving of freight and other charges.

(2)  The total of--

(i)  The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto, but excluding any costs attributable to supplies or services paid or to be paid under paragraph (g)(1) of this clause;

(ii)  The cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract if not included in subdivision (g)(2)(i) of this clause; and

(iii)  A sum, as profit on subdivision (g)(2)(i) of this clause, determined by the Contracting Officer under 49.202 of the Federal Acquisition Regulation, in effect on the date of this contract, to be fair and reasonable[.].

(3)  The reasonable costs of settlement of the work terminated[.]

4

FAR 52.249-2(g). The provision further states that "[t]he cost principles and procedures of part 31 of the Federal Acquisition Regulation . . . shall govern all costs claimed, agreed to, or determined under this clause." FAR 52.249-2(i).

10. In turn, FAR 31.201-2, DETERMINING ALLOWABILITY, sets forth five requirements that the contractor must meet to show that a cost is allowable:

> (a) A cost is allowable only when the cost complies with all of the following requirements:
>
> > (1) Reasonableness.
> >
> > (2) Allocability.
> >
> > (3) Standards promulgated by the CAS Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the circumstances.
> >
> > (4) Terms of the contract.
> >
> > (5) Any limitations set forth in this subpart.

FAR 31.201-2.

11. As to the Reasonableness requirement, the FAR provides:

> (a) A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. Reasonableness of specific costs must be examined with particular care in connection with firms or their separate divisions that may not be subject to effective competitive restraints. No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.
>
> (b) What is reasonable depends upon a variety of considerations and circumstances, including—

(1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

(2) Generally accepted sound business practices, arm's-length bargaining, and Federal and State laws and regulations;

(3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and

(4) Any significant deviations from the contractor's established practices.

FAR 31.201-3, DETERMINING REASONABLENESS.

12. As to the Allocability requirement, the FAR provides:

A cost is allocable if it is assignable or chargeable to one or more cost objectives on the basis of relative benefits received or other equitable relationship. Subject to the foregoing, a cost is allocable to a Government contract if it—

(a) Is incurred specifically for the contract;

(b) Benefits both the contract and other work, and can be distributed to them in reasonable proportion to the benefits received; or

(c) Is necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown.

FAR 31.201-4, DETERMINING ALLOCABILITY.

## II. The Air Force Takes Corrective Action After A Bid Protest

13. On June 2, 2021, the incumbent pallet contractor, AAR Manufacturing, Inc. d/b/a AAR Mobility Systems (AAR), protested the Wolverine award to the Government Accountability Office (GAO) (JSF ¶ 18).

14.  Two days later, on June 4, 2021, Wolverine intervened in the AAR Protest (gov't supp. R4, tab 13).  As intervenor, Wolverine received all GAO filings, including the protest.  *See* 4 C.F.R. § 21.3(a), (e).

15.  On June 4, 2021, the Contracting Officer issued a stop-work order by email, which directed Wolverine to "cease all work for subject contract in accordance with FAR 52.242-15, Stop Work Order" (R4, tab 2).  About a month later, on July 1, 2021, the Air Force notified GAO that it would take corrective action by "reopen[ing] discussions, and evaluat[ing] proposals in accordance with the solicitation.  Following the evaluation of revised proposals, the Agency will make a new best value award decision" (gov't supp. R4, tab 14 at 1).

16.  Because the corrective action rendered moot AAR's protest, on July 2, 2021, GAO granted the Air Force's request for dismissal (JSF ¶ 21; gov't supp. R4, tab 14 at 2; gov't supp. R4, tab 15 at 1).  In dismissing the protest, GAO summarized the Air Force's corrective action plan and stated that the "agency also plans to continue the suspension of contract performance while implementing the aforementioned corrective action" (gov't supp. R4, tab 15 at 1).

17.  On July 7, 2021, the Contracting Officer issued Modification No. P0001, which incorporated the stop-work order into the Pallet Contract.  Modification No. P0001 states that its purpose was to "[i]ssue a Stop Work Order in accordance with FAR 52.242-15 against [the] contract," effective "04 Jun 2021, which is the date the PCO [procuring contracting officer] (Mr. Tim Hudson) notified Wolverine Industries POC [point of contact] that a Stop Work Order has been issued" (R4, tab 3 at 2).  "All other terms and conditions remain unchanged" (*id.*).

## III.  Wolverine Resumes Performance Of The Original Pallet Contract While The Air Force Implements Corrective Action

18.  After GAO dismissed the AAR protest, the Air Force proceeded with corrective action.  In a September 15, 2021 letter to Wolverine, the Air Force stated:

> A stop work order was issued for contract FA8534-21-D-0002.
> Since, corrective action has been taken.  Pursuant to
> FAR 15.306(d), further discussions are hereby needed and
> reopened with all offerors within the competitive range.
> Following the instructions found in Section L - Instruction to
> Offerors, Offerors are permitted to provide revisions to either
> alter, update and/or clarify any or all volumes (RFP,

Technical, Past Performance, Small Business Participation, Price, etc.) of their proposal.

(R4, tab 4 at 1)

19. The Air Force's September 15, 2021 letter further notified Wolverine that, following discussions, offerors would be given an opportunity to submit final proposal revisions (R4, tab 4 at 1). In turn, the Air Force requested that Wolverine "extend[] the validity of [its] proposal through 31 Mar 2022," to which Wolverine agreed (*id.*).

20. The Air Force took no further action on the stop-work order—such as by extending the order, terminating the contract, or adjusting the May 28, 2022 deadline for first article delivery (JSF ¶ 24). The Air Force also placed no order for pallets under the Pallet Contract (gov't cross-mot., attach. (aff. of T. Hudson (Hudson aff.) ¶ 13)).

21. The Rule 4 file contains no communication between Wolverine and the Air Force about Wolverine's performance under the Pallet Contract after the AAR protest was dismissed.

22. Even so, Wolverine placed over $2 million in orders for materials and equipment that it intended to use in first articles and production pallets (app. mot., ex. A (aff. of J. Smith (Smith aff.) ¶ 30)). The bulk of that amount ($1,599,400) was placed with a supplier, Modern Forge Companies, on September 20, 2021, for 220,000 "D-Rings" (*id.* ¶ 31). Of those 220,000 D-Rings, Wolverine needed 132 rings to produce six (6) first articles for testing; the remaining 219,868 rings were purchased "in anticipation of Air Force Orders during the first Option" period (*id.* ¶¶ 22, 30-31).

23. Wolverine also purchased dies and other equipment from Zarbana Aluminum Extrusions LLC totaling $400,961 that were needed to "produce the [first articles]," which Wolverine would reuse for "the expected production [p]allets" (*id.* ¶ 37). On top of these materials costs, Wolverine "incurred operating costs of $107,987 following expiration of the Stop Work Order" (*id.* ¶ 38). Wolverine asserts that its "post-Stop Work Order costs totaled $2,126,348.00" (*id.* ¶ 39).

## IV. The Air Force Terminates Wolverine's Contract For Convenience

24. The Air Force's corrective action resulted in an award to AAR on April 13, 2022 (R4, tab 5 at 1). Wolverine protested the award to GAO, which denied the protest in a published decision on July 26, 2022 (gov't supp. R4, tab 27 at 15).

25. On March 29, 2023, around eight months after GAO dismissed Wolverine's protest, the Air Force terminated the Pallet Contract for convenience (JSF ¶ 25). On

May 31, 2023, Wolverine submitted a convenience termination proposal requesting $1,242,068 in costs as follows:

| | | |
|---|---|---|
| (1) | Contract price for completed FAT Pallets | $18,000 |
| (2) | The sum of costs incurred in the performance of the work, plus the cost of settling and paying termination costs under terminated subcontracts; and fair and reasonable profit on these costs | |
| | Operating costs incurred between 18 May to 4 June 2021 | $35,308 |
| | Operating costs incurred between 5 Sept to 31 Dec 2021 | $107,987 |
| | Modern Forge Termination Fee | $473,164 |
| | Inventoried D-Rings [@ $7.27/unit cost] | $359,175 |
| | Pallet Dies | $75,000 |
| | *Subtotal* | *$1,050,634* |
| | Profit [@ 15%] | $157,595 |
| | *Total* | *$1,208,229* |
| (3) | The reasonable cost of settlement of the work terminated, including accounting, legal, clerical, and other expenses to prepare the termination settlement proposal. | $15,839 |
| | *Total* | *$1,242,068* |

(R4, tab 7 at 5)

26. On August 21, 2023, the Air Force offered to pay Wolverine's claimed operating costs between May 18, 2021 (award) and June 4, 2021 (stop-work order), which totaled $35,308 (app. SOF ¶ 43). On February 9, 2024, after the Air Force confirmed that $35,308 was its final position, Wolverine certified its proposal as a claim

9

(app. SOF ¶¶ 44-45; R4, tab 12).  On April 12, 2024, Wolverine filed this appeal from a deemed denial of its certified claim (gov't SOF ¶ 39).[*]

## V.  The Parties' Summary Judgment Motions

27.  Wolverine seeks summary judgment as to its entitlement to recover costs incurred after the stop-work order expired on September 2, 2021.  Unlike its convenience termination proposal, which clearly identifies specific costs, like inventoried D-Rings and a termination fee, Wolverine's summary judgment motion seeks rulings on six cost categories, which differ in framing from the costs listed in the convenience termination proposal:

> (1)  "[C]osts allocable to preparing to manufacture and to manufacture the FAT Pallets, including costs of necessary dies and welding fixtures";
>
> (2)  "[T]he initial costs and costs allocable to preparation for manufacturing the number of production Pallets the Air Force directed Wolverine to expect to be ordered during the Option 1 period, including the costs to purchase the necessary number of D-Rings";
>
> (3)  "[S]ettlement costs with suppliers";
>
> (4)  "[A]llocable operating costs from the expiration of the Stop Work Order until contract termination";
>
> (5)  "[R]easonable profit on preparations made and work done by Wolverine in the manufacture of the FAT [first article test] Pallets and in advance of the expected production Pallet orders"; and
>
> (6)  "[T]he reasonable costs to negotiate a termination settlement prior to initiation of the claim underlying this Appeal."

(R4, tab 7 at 5; app. mot. at 6)  We refer to the costs in the first four categories as the Disputed Costs.  We refer to the last two categories—"fair and reasonable profit" and "reasonable costs to negotiate a termination settlement"—as the Undisputed Costs.

---

[*]  The Air Force paid $35,308 to Wolverine in or around September 2024 (app. supp. R4, tab 14 at 1-2).

28. Although the Air Force does not appear to contest Wolverine's entitlement to the Undisputed Costs, the Air Force contends that the Disputed Costs are unallowable and asks for two legal rulings on its cross-motion: (1) that "[t]he stop work order was effective June 4, 2021, and remained in effect through termination of the contract for convenience of the government on March 29, 2023"; and (2) that "Wolverine's recoverable termination for convenience costs, including reasonable profit and settlement costs, are limited to First Article costs incurred between May 18, 2021 and June 4, 2021" (gov't cross-mot. at 22).

<u>DECISION</u>

## I. Legal Standards

### A. Summary Judgment

In deciding summary judgment motions, we look to the standards under Rule 56 of the Federal Rules of Civil Procedure. *H&L Contracting LLC*, ASBCA No. 63695, 25-1 BCA ¶ 38,715 at 188,240. Thus, we will grant summary judgment only if there is no genuine issue as to any material fact, such that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises when the non-movant presents sufficient evidence upon which a reasonable fact-finder, drawing the requisite inferences and applying the applicable evidentiary standard, could decide the issue in favor of the non-movant." *Sauer Constr., LLC*, ASBCA No. 63738, 25-1 BCA ¶ 38,744 at 188,344. "The moving party bears the burden of establishing the absence of any genuine issue of material fact[.]" *Mingus Constructors v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Moreover, in considering a summary judgment motion, we "construe the evidence in the light most favorable to the non-movant and draw all reasonable inferences in its favor." *Goodloe Marine, Inc.*, ASBCA Nos. 62106, 62446, 22-1 BCA ¶ 38,053 at 184,774.

When, as in this case, the parties file cross-motions for summary judgment, both motions can be denied when resolution of factual issues is required, and "ruling against one party is not the same as ruling for the other." *GEMS Env't Mgmt. Servs.*, ASBCA No. 61737 *et al.*, 24-1 BCA ¶ 38,621 at 187,743.

### B. Convenience Termination Costs

As discussed above, the Pallet Contract incorporates FAR 52.249-2(g)(2), Termination for Convenience of the Government (Fixed-Price), which controls cost recovery in a convenience termination. *See 4H Constr. Corp.*, ASBCA Nos. 59977, 60000, 19-1 BCA ¶ 37,317 at 181,509. Under that provision, when a contract is terminated for convenience and the parties do not reach a settlement, the contractor is

entitled to recover: (1) "[t]he costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto;" (2) "[t]he cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract"; and (3) "fair and reasonable" profit. FAR 52.249-2(g)(2).

FAR 52.249-2 further provides that "[t]he cost principles and procedures of part 31 of the Federal Acquisition Regulation, in effect on the date of this contract, shall govern all costs claimed, agreed to, or determined under this clause." *Id.* 52.249-2(i). In turn, FAR part 31 provides that a "cost is allowable only when the cost complies with all of the following requirements: (1) Reasonableness; (2) Allocability; (3) Standards promulgated by the CAS Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the circumstances; (4) Terms of the contract; and (5) Any limitations set forth in this subpart." FAR 31.201-2(a). In a dispute over convenience termination costs, the "[a]ppellant bears the burden to prove by a preponderance of the evidence that it is entitled to a greater termination settlement amount than that determined by the [contracting officer]." *Gen. Dynamics Land Sys., Inc.*, ASBCA No. 52283, 02-1 BCA ¶ 31,659 at 156,410.

Given this cost-recovery framework, we first address the Air Force's cross-motion because the requested rulings, if granted, would bar Wolverine's claim to all Disputed Costs. Next, we address Wolverine's summary judgment motion, which relates to whether Wolverine's Disputed Costs are allowable.

## II. The Air Force Has Not Demonstrated That Wolverine's Disputed Costs Are Unallowable As A Matter Of Law

In its cross-motion, the Air Force requests that we issue two legal rulings: (1) that the "stop work order was effective June 4, 2021 and remained in effect through termination of the contract for convenience of the government on March 29, 2023," and (2) that "Wolverine's recoverable termination for convenience costs, including reasonable profit and settlement costs, are limited to First Article costs incurred between May 18, 2021 and June 4, 2021" (gov't cross-mot. at 22). We deny the Air Force's request for such rulings because the stop-work order expired after 90 days, and, in any event, even if the stop-work order remained in effect through contract termination, nothing in FAR 52.233-3 precludes recovery of all costs incurred during a work stoppage.

### A. The Stop-Work Order Cited FAR 52.242-15 And Expired After 90 Days

The Air Force contends that the stop-work order should be treated as if it had been issued under FAR 52.233-3, PROTEST AFTER AWARD, rather than the cited provision, FAR 52.242-15, STOP-WORK ORDER, because the order was issued in connection with a bid protest (gov't cross-mot. at 16-17). According to the Air Force, the

Contracting Officer's citation to FAR 52.242-15 was a mistake; if the order properly cited FAR 52.233-3, it would have remained in effect until the March 29, 2023 contract termination (*id.* at 18, 22). But the Air Force has not shown a basis for us to rewrite the stop-work order to cite the correct FAR provision.

FAR 52.233-3 is the provision tailored to bid protests. It authorizes the Contracting Officer to issue a stop-work order "[u]pon receipt of a notice of protest (as defined in FAR 33.101) or a determination that a protest is likely," and requires that any stop-work order be specifically identified as issued under that provision. FAR 52.233-3(a). "Upon receipt of the final decision in the protest," the Contracting Officer must either cancel the order or terminate the work covered by it. FAR 52.233-3(a).

FAR 52.242-15 is a general contract administration tool that permits the government to stop work at its convenience. It also requires the Contracting Officer to either cancel the stop-work order or terminate the work covered by it within 90 days (absent an agreed extension); however, if such action is not taken, the order expires and the contractor must resume performance. FAR 52.242-15(a).

Here, we agree that the Air Force should have issued a stop-work order under FAR 52.233-3, but the choice of provision should not have changed the result. Under both FAR 52.233-3 and FAR 52.242-15, the Contracting Officer was required to cancel the order or terminate the work—either upon receipt of the final protest decision (FAR 52.233-3) or within 90 days of order issuance (FAR 52.242-15). But the Contracting Officer did neither. Instead, five days after protest dismissal, on July 7, 2021, the Contracting Officer incorporated the stop-work order into the Pallet Contract by modification, again citing FAR 52.242-15, and did not terminate the contract until March 29, 2023. Given these circumstances, we apply the stop-work order according to its terms, which means that it expired on September 2, 2021—90 days after its issuance—pursuant to FAR 52.242-15.

The Air Force argues that we must nonetheless treat stop-work order as if it cited FAR 52.233-3 for three reasons: (1) citing FAR 52.242-15 was a mistake; (2) the Contracting Officer lacked authority to issue a stop-work order under FAR 52.242-15 in connection with a bid protest; and (3) applying the FAR 52.242-15 stop work order would conflict with the Competition in Contracting Act (CICA) and bid-protest procedures. We do not find these arguments persuasive.

First, the Air Force concedes that issuing the stop-work order under FAR 52.242-15 was its own mistake (gov't cross-mot. at 16-17; Hudson aff. ¶ 6). But the Air Force has not raised (or supported) a mistake defense that would warrant rewriting the stop-work order to cite FAR 52.233-3.

Second, the Air Force contends that issuing a stop-work order under FAR 52.242-15 was unauthorized and the "government is not bound by acts of its agents beyond the bounds of that agent's actual authority" (gov't cross-mot. at 17). But the Air Force has not shown that the Contracting Officer lacked authority to issue a stop-work order under FAR 52.242-15. In any event, this argument cuts against the Air Force because the only stop-work order here cites FAR 52.242-15. If the Contracting Officer lacked authority to issue it, then no valid order would have limited Wolverine's right to perform under the Pallet Contract.

Third, applying the order as written does not conflict with CICA or bid-protest procedures. The stop-work order here satisfied CICA because it stayed performance while the protest was underway. The dispute here concerns the post-protest period, when the Contracting Officer was required to cancel the order or terminate the contract.

In sum, the stop-work order was issued under FAR 52.242-15, and it expired 90 days after issuance. Accordingly, we deny the Air Force's request for a ruling that the stop-work order remained in effect until contract termination (gov't cross-mot. at 22).

## B. Even If FAR 52.233-3 Applied, That Provision Does Not Preclude Recovery Of All Costs Incurred During A Work Stoppage

Even if the Air Force had issued a stop-work order under FAR 52.233-3, we would still deny its request for a ruling that "Wolverine's recoverable termination for convenience costs, including reasonable profit and settlement costs, are limited to First Article costs incurred between May 18, 2021 and June 4, 2021" (gov't cross-mot. at 22).

As the Air Force recognizes, "the termination for convenience clause in Wolverine's contract (FAR 52.249-2) controls" compensation in a convenience termination (*id*. at 20). Thus, unless a contract clause specifically addresses cost recovery in a convenience termination, allowability is governed by FAR 31.201-2. *See 4H Constr.*, 19-1 BCA ¶ 37,317 at 181,509. For instance, in *4H Construction Corp.*, the government refused to pay preparatory costs incurred by the contractor as part of a convenience termination settlement because the government had not issued a notice to proceed before the contractor incurred those costs. *Id.* In rejecting the government's argument, we determined that the preparatory costs were allowable because, among other things, nothing in the notice-to-proceed provision "establishe[d] an absolute bar to recovery of costs incurred prior to that notice." *Id*.

The same logic applies here. Even if the Air Force properly cited FAR 52.233-3 in the stop-work order, that provision would not establish an absolute bar to Wolverine recovering costs incurred during the stoppage. FAR 52.233-3(a) directs the contractor to "take all reasonable steps to *minimize* the incurrence of costs allocable to the work covered by the order during the period of work stoppage." FAR 52.233-3(a) (emphasis

14

added).  Section 52.242-15(a) contains the same requirement.  FAR 52.242-15(a).  Requiring the contractor to take steps to minimize costs during a work stoppage does not mean that the contractor may incur no cost at all.  And FAR 52.233-3 says nothing about cost allowability in a convenience termination.  Thus, FAR 52.233-3 does not render all costs incurred during a work stoppage unallowable in a convenience termination.  Of course, just because all Disputed Costs are not *unallowable* does not prove that any of Wolverine's Disputed Costs are *allowable*.  *See* Section IV.A, *infra*.  But given the posture of this case and the limited record before us, it is too early for us to make that determination.

Accordingly, we deny the Air Force's request for a ruling that "Wolverine's recoverable termination for convenience costs, including reasonable profit and settlement costs, are limited to First Article costs incurred between May 18, 2021 and June 4, 2021" (gov't cross-mot. at 22).

**C.  The Air Force's Argument That Wolverine Improperly Incurred Disputed Costs After The Stop-Work Order Raises Factual Issues About Cost Reasonableness**

Several of the Air Force's arguments—that Wolverine knew corrective action was underway, failed to seek clarification from the contracting officer, and intended to use resumed performance to strengthen its proposal revision—are best understood as factual challenges to the reasonableness of Wolverine's costs (*id*. at 18-20).  The Air Force, however, has not moved for summary judgment on cost reasonableness; thus, we address these arguments below in connection with Wolverine's motion (*see* Section IV.A, *infra*).

**D.  Wolverine's Recovery Is Not Limited By A "Minimum Contract Value"**

Finally, the Air Force contends that Wolverine can recover no additional costs under the convenience termination clause because "a contractor is not entitled to costs associated with work never ordered by the government" (*id*. at 21).  In support of this point, the Air Force cites *Smart Way Transportation* in which we stated that "the suspension of work and termination for convenience clauses provide no relief when no work was ordered under an IDIQ [indefinite delivery/indefinite quantity] contract and the contractor has been paid the minimum contract value."  *Smart Way. Transp. Servs.*, ASBCA No. 60315, 16-1 BCA ¶ 36,569 at 178,112.

But *Smart Way* does not apply here.  Although the Pallet Contract contemplates pallet delivery based on orders, the contract also required Wolverine to deliver first articles for testing within 365 days after award (*id.* at 3-4, 68).  No order was needed to start preparing first articles.  Thus, the fact that no pallet order was placed does not—by itself—categorically bar Wolverine from recovering convenience termination costs.

## III. Wolverine Is Entitled To Summary Judgment As To The Undisputed Costs

Although the Air Force denied Wolverine's claim for any cost other than operating costs incurred before June 4, 2021, the Air Force now recognizes that Wolverine is entitled to recover the Undisputed Costs: "fair and reasonable" "profit" on allowable costs of the work performed; and the "reasonable cost of preparing Wolverine's settlement proposal" (gov't cross-mot. at 3).

Under FAR 52.249-2, a convenience termination settlement includes "fair and reasonable" "profit" on the costs of the work performed. FAR 52.249-2(g)(2)(iii). In addition, the contractor is entitled to recover the "reasonable costs of settlement of the work terminated," which includes accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data." FAR 52.249-2(g)(3).

Here, although the parties disagree as to the scope of the allowable "costs of the work performed," they agree that Wolverine is entitled to "fair and reasonable" "profit" on such costs as part of a convenience termination settlement under FAR 52.249-2(g)(2)(iii) (app. mot. at 18; gov't cross-mot. at 3). The parties also agree that Wolverine may recover "the reasonable costs of settlement of the work terminated" under FAR 52.249-2(g)(3) (app. mot. at 18; gov't cross-mot. at 3). Accordingly, we grant Wolverine's summary judgment motion on its entitlement to the Undisputed Costs.

## IV. Wolverine Is Not Entitled To Summary Judgment On The Disputed Costs

In its summary judgment motion, Wolverine contends that no factual issue exists as to its entitlement to four Disputed Cost categories:

> (1) "[C]osts allocable to preparing to manufacture and to manufacture the FAT Pallets, including costs of necessary dies and welding fixtures";
>
> (2) "[T]he initial costs and costs allocable to preparation for manufacturing the number of production Pallets the Air Force directed Wolverine to expect to be ordered during the Option 1 period, including the costs to purchase the necessary number of D-Rings";
>
> (3) "[S]ettlement costs with suppliers";
>
> (4) "[A]llocable operating costs from the expiration of the Stop Work Order until contract termination";

16

(app. mot. at 6). We do not agree. Because factual issues exist as to all Disputed Cost categories, we deny the remaining portion of Wolverine's summary judgment motion.

At the outset, we emphasize that the Disputed Cost categories described by Wolverine do not lend themselves to resolution on summary judgment because they lack clarity. For instance, the largest cost—for the D-Rings—appears to fall into three separate categories: (1) "[c]osts allocable to preparing to manufacture and to manufacture the FAT Pallets;" (2) costs allocable for preparing to manufacture production pallets"; and (3) as a "settlement cost" (app. mot. at 6, 12, 14). Wolverine also requests costs for dies as both "Costs to Produce First Article Test Pallets" and "Initial and Preparatory Costs" (*id*. at 11, 13). In addition, Wolverine treats operating costs as both a standalone cost category and a subset of first article costs (app. mot. at 11, 16-17; app. reply at 14). The overlap makes it difficult for us to rule on a categorical basis.

Accordingly, because we cannot meaningfully address Wolverine's entitlement in terms of the Disputed Cost categories, we address those costs in terms of the FAR 31.201-3 allowability framework. That framework requires, among other things, that costs are reasonable and allocable to the contract. FAR 31.201-2(a)(1), (2). As explained below, Wolverine has not shown the absence of a factual issue as to whether any Disputed Cost is reasonable under FAR 31.201-3. Wolverine also fails to show the absence of a factual issue as to whether its entire D-Ring purchase—or any other cost for materials that Wolverine would use in production—is allocable to the Pallet Contract. Accordingly, we deny the Wolverine's summary judgment motion as to the Disputed Costs:

### A. Factual Issues Preclude Summary Judgment On Whether The Disputed Costs Are Reasonable

Under FAR 31.201-3, a cost is reasonable "if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." FAR 31.201-3(a). FAR 31.201-3 further provides that "[n]o presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable." FAR 31.201-3(a).

Determining whether a cost is reasonable "depends upon a variety of considerations and circumstances," including the following:

> (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

(2) Generally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations;

(3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and

(4) Any significant deviations from the contractor's established practices.

FAR 31.201-3(b).

"The reasonableness of a cost is a question of fact based on applicable legal principles." *Kellogg Brown & Root Servs., Inc. v. Sec'y of the Army*, 973 F.3d 1366, 1370 (Fed. Cir. 2020) (citing *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1360 (Fed. Cir. 2013)). Determining cost reasonableness requires "consideration of *all* the factual circumstances relating to incurrence of the costs in question, including the amount incurred" given that FAR 31.201-3 "expressly refers to the 'nature *and amount*' of the cost in assessing reasonableness." *Abt Assocs. Inc.*, ASBCA No. 54871, 06-1 BCA ¶ 33,218 at 164,633 (emphasis in original).

Here, factual issues exist about whether a "prudent person in the conduct of competitive business" would have incurred some or all of Wolverine's Disputed Costs under the circumstances presented. In support of its motion, Wolverine relies on the affidavit of its Chief Financial Officer, Julie Smith, who explains that Wolverine needed to resume performance after the stop-work order expired to ensure timely delivery of first article test units and to prepare for the large production quantities contemplated in the Pallet Contract's option periods (Smith aff. ¶¶ 30-37).

The Air Force has provided contrary evidence to rebut Wolverine's assertion that it needed to resume performance 90 days after the stop-work order was issued. First, on July 1, 2021, the Air Force advised GAO—and Wolverine as intervenor—that it intended to take corrective action by reopening discussions, evaluating proposal revisions, and making a new best value award decision (gov't supp. R4, tab 14 at 1). Second, in GAO's dismissal order issued the following day, July 2, 2021, GAO stated that the Air Force "plans to continue the suspension of contract performance while implementing the aforementioned corrective action" (gov't supp. R4, tab 15 at 1). Third, on September 15, 2021, five days before Wolverine placed its order for 220,000 D-Rings, the Air Force notified Wolverine that discussions with offerors had been reopened and that it would solicit new proposal revisions (R4, tab 4 at 1).

Accordingly, conflicting evidence reflects factual issues as to whether a "prudent person in the conduct of competitive business" would have incurred over $2 million in

Disputed Costs without first conferring with the Air Force about continued performance under the Pallet Contract—no matter what FAR provision the stop-work order cited. *See* FAR 31.201-3. In addition, the parties have not addressed their arguments under FAR 31.201-3(b)'s four-factor framework, which could inform the Board's determination on reasonableness. Finally, in determining whether the costs are reasonable, the FAR also specifies that we must consider both the "nature and amount" of those costs; however, Wolverine's motion speaks to only the general nature of the costs. FAR 31.201-3(a). Accordingly, because factual issues preclude us from determining whether the Disputed Costs are reasonable, we deny Wolverine's summary judgment motion as to those costs.

**B. Factual Issues Preclude Summary Judgment On Whether Production Materials Are Allocable To The Pallet Contract**

We also deny Wolverine's summary judgment motion as to recovery of "initial costs and costs allocable to preparation for manufacturing the number of production Pallets the Air Force directed Wolverine to expect to be ordered during the Option 1 period, including the costs to purchase the necessary number of D-Rings" (app. mot. at 6). Factual issues exist as to whether such costs are allocable to the Pallet Contract, as required by FAR 31.201-2(a)(2). Although we understand these costs to comprise Wolverine's D-Ring purchase, our reasoning would apply to any other costs incurred for manufacturing production pallets.

The Pallet Contract provides that "[b]efore first article approval, the acquisition of materials or components for, or the commencement of production of, the balance of the contract quantity is at the sole risk of the Contractor." FAR 52.209-4(h). Thus, the Pallet Contract warns that "[b]efore first article approval, the costs thereof shall not be allocable to this contract for . . . (2) termination settlements if the contract is terminated for the convenience of the Government." FAR 52.209-4(h).

Here, Wolverine acknowledges that it placed an order for 220,000 D-Rings even though it needed only 132 to produce six first articles (Smith aff. ¶¶ 22, 31). Wolverine intended to use the remaining 219,868 D-Rings in pallet production after obtaining first article approval (*id.* ¶ 30). Accordingly, under FAR 52.209-4(h), those 219,868 D-Rings are not allocable to the Pallet Contract. *See, e.g., Logus Mfg. Corp.*, ASBCA No. 48120, 99-2 BCA ¶ 30,566 at 150,950.

Even so, Wolverine contends (explicitly or implicitly) that the D-Ring costs are allocable to the Pallet Contract under three implied exceptions to FAR 52.209-4(h) that have been recognized in Board precedent: (1) when it would be impossible to wait until first article approval and still meet the delivery schedule; (2) when suppliers require a minimum-buy quantity that exceeds the amount needed for first articles; and (3) when the government directs or encourages advance procurement, or refuses to grant a justified

extension.  *See id.* at 150,950 (citing *Young Metal Prods., Inc.*, ASBCA No. 15701, 71-1 BCA ¶ 8,827; *Switlik Parachute Co.*, ASBCA No. 18024, 75-2 BCA ¶ 11,434).

Wolverine has not demonstrated its entitlement to summary judgment on any of these implied exceptions to FAR 52.209-4(h).  First, as to impossibility, Wolverine points only to a "risk" of delayed deliveries, not to evidence that timely performance would have been impossible without procuring production materials before first article approval (*see* Smith aff. ¶ 30).  Second, as to a minimum buy, Wolverine argues that Modern Forge required a purchase of 220,000 D-Rings (app. reply at 16), but its supporting affidavit states only that Wolverine "placed an order" for that quantity, without attesting that Modern Forge refused to sell a lesser amount (Smith aff. ¶ 31).  Third, as to government direction, Wolverine points to contractual BEQs and schedule expectations (app. mot. at 15), but the Pallet Contract expressly placed the risk of buying production materials before first article approval on Wolverine, and Wolverine produced no evidence of a waiver.  *See Rex Sys., Inc.*, ASBCA No. 59624, 16-1 BCA ¶ 36,350 at 177,218 (waiver of FAR 52.209-3(h) requires "clear government direction").  Moreover, although Wolverine states that the Air Force did not extend the schedule (app. mot. at 3) in connection with the stop-work order, FAR 52.242-15 requires Wolverine to "assert[] its right to the adjustment within 30 days after the end of the period of work stoppage."  FAR 52.242-15(b)(2).  Wolverine has produced no evidence of such an assertion.

On this record, because Wolverine has not shown the absence of a factual issue that would demonstrate the allocability of some or all its D-Rings, or any other materials, to the Pallet Contract, we deny its summary judgment motion as to these Disputed Costs.

## C.  Settlement Costs

Finally, we address Wolverine's request for "settlement costs with suppliers," which are governed by a separate FAR provision, FAR 49.108-3 (app. mot. at 1).

Under the Termination for Convenience clause, any unilateral settlement determination by the government is to include, among other things, the "cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract."  FAR 52.249-2(g)(2)(ii).  In evaluating subcontractor settlements, the FAR directs the contracting officer to "determine if the settlement was arrived at in good faith, is reasonable in amount, and is allocable to the terminated portion of the contract (or, if allocable only in part, that the proposed allocation is reasonable)."  FAR 49.108-3(c).

Here, Wolverine has not fully addressed what costs comprise "settlement costs with suppliers."  The convenience termination proposal mentions a single cost for settling with one supplier—the "Modern Forge Termination Fee" for $473,164 (R4, tab 7 at 5); however, Wolverine's summary judgment motion more broadly requests "settlement costs

20

with suppliers for first article tooling, components and materials" (app. reply at 17). Wolverine neither states whether it settled with suppliers other than Modern Forge, nor identifies what materials or work those settlements resolved.

In any event, even if the Modern Forge termination fee were the only "settlement cost[] with a supplier," Wolverine has not shown the absence of a factual issue as to whether its settlement "was arrived at in good faith, is reasonable in amount, [or] is allocable to the terminated portion of the contract[.]" FAR 49.108-3(c). Aside from some limited information about Wolverine's termination settlement with Modern Forge in its supporting affidavit (Smith aff. ¶ 42), Wolverine has produced insufficient evidence to establish for summary judgment purposes that the settlement was negotiated in good faith and reasonable in amount. FAR 49.108-3(c). And as to allocability, the Modern Forge termination fee applies to Wolverine canceling a portion of its D-Ring purchase (app. mot. at 13-14). But if the D-Ring costs are not allocable, then any fee paid to settle with the D-Ring supplier is not allocable either. Thus, based on this record, we deny Wolverine's summary judgment motion on the allowability of settlement costs with suppliers.

CONCLUSION

For these reasons, we grant Wolverine's summary judgment motion as to the Undisputed Costs and deny its motion as to the Disputed Costs. We deny the Air Force's cross-motion. Within 14 days of this decision, the parties must submit a joint status report proposing a schedule for further proceedings.

Dated: January 22, 2026

ERIC E. LAUFGRABEN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

OWEN WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63877, Appeal of Wolverine Tube, Inc., rendered in conformance with the Board's Charter.

Dated:  January 22, 2026

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals